234 N.J. Super. 37 (1989)
559 A.2d 1381
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-APPELLANT,
v.
PHILIP R.T. CARROLL AND MRS. PHILIP R.T. CARROLL, DEFENDANTS-RESPONDENTS, AND TOWNSHIP OF MOUNT LAUREL, IN THE COUNTY OF BURLINGTON, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 1989.
Decided June 12, 1989.
*39 Before Judges PETRELLA, SHEBELL and LANDAU.
Bernard M. Flynn, Deputy Attorney General, argued the cause for appellant (Peter N. Perretti, Jr., Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Bernard M. Flynn, on the brief).
Philip R.T. Carroll, respondent, argued the cause pro se.
The opinion of the court was delivered by SHEBELL, J.A.D.
*40 Plaintiff, State of New Jersey, by the Commissioner of Transportation, appeals from the August 17, 1988 order of the Law Division which dismissed its complaint for condemnation of a portion of lands owned by defendants Mr. and Mrs. Philip R.T. Carroll (hereinafter referred to in the singular, Carroll) along Route 38 in Mount Holly. The trial court held that the filing of the condemnation action was premature under N.J.S.A. 20:3-6, which provides that no action to condemn shall be instituted unless bona fide negotiations have been completed. We affirm.
The New Jersey Department of Transportation (DOT) notified defendant Carroll by letter dated August 11, 1986 that the State required a portion of his property for the Route 38 project. The letter noted that Carroll would soon be contacted by the State's appraiser, and further stated:
Negotiations are scheduled to begin following the completion and review of the appraisals. Prior to visiting your property to meet with you, our representative will individually contact you to arrange mutually convenient appointments. The negotiators will be prepared to explain the basis of the State's monetary offer and to answer any questions that you may have regarding the transactions.
Defendant was contacted and an appointment was arranged for the appraisal for March 13, 1987. The appraisal set the fair market value of the taking at $14,500. A negotiator for the Bureau of Acquisition in the Division of Right of Way, DOT, met with Carroll in his home on July 8, 1987 and presented him with a copy of the appraisal. She stated in her certification in opposition to defendant's motion to dismiss, "I attempted to explain the appraisal process, but Mr. Carroll stated that the offer was much too low and there was no need to discuss the matter any further. He requested that I leave and I did so."
On July 17, and again on August 5, 1987, the negotiator attempted to arrange a meeting with Carroll to discuss the State's offer. Defendant maintained his position that there was no need to meet, as he would not accept the State's offer unless the State agreed to compensate him for the trees which were located on the parcel the State would be taking and agreed to *41 change its method of appraisal. The negotiator told Carroll that the appraiser had determined that in this case the trees did not enhance the value of the property, and that the front-foot appraisal method desired by Carroll was inappropriate as he was not losing the entire buildable depth behind the frontage. Carroll responded that if the appraisal could not be changed, then the matter should be submitted to the courts for resolution.
A DOT representative stated in a letter dated August 11, 1987:
Although we do understand and sympathize with your concern for the trees, in the absence of a professional appraisal which would support the notion that land is more valuable with trees than if there were no trees, we cannot change our appraisal or offer. Further, as explained by [our negotiator], the front foot unit value is defined as one foot along the frontage plus the rectangle behind it to the maximum buildable depth. Since our taking only involves a small portion of the entire buildable depth behind the frontage, front feet is not an appropriate unit to estimate value. The square foot unit of value is the more applicable unit of measurement in this instance.
We will submit this case for management review and continue negotiations at the next level to protect your rights. This step results in an overwhelming percentage of agreements, and we are confident this will be the outcome for you.
We would like to continue negotiations with you if you feel it's possible to resolve this matter. Unless we hear from you within 5 days after receipt of this letter, we will assume that you are unwilling to accept our proposed settlement at this time, and we will submit this case to our management for reassignment and preliminary condemnation proceedings so that we can move promptly to an independent finding of value should further negotiations not reach an amicable solution.
Carroll responded by letter dated August 25, 1987, in which he stated:
For the record, I do not feel that thus far any negotiations have been conducted. I was given a single appraisal report which on its face was defective and unworthy of discussion. Nonetheless, I am perfectly willing to enter into good faith negotiations and for that purpose will write to you as soon as I can setting forth my viewpoint of the compensation and damage to which I am entitled pursuant to the Eminent Domain Act of 1971, as amended, NJSA 20:3-1 et. seq.
The DOT representative responded by September 3, 1987 letter:

*42 I have discussed this matter with ... the Negotiator in this matter and we both are ready and willing to meet with you at your convenience, to negotiate this taking.
You have indicated that as soon as you are prepared, you will contact this office and arrange an appointment; accordingly, we will await your call.
Unfortunately, a letter dated September 2, 1987 was sent from the DOT, Bureau of Acquisition informing Carroll that:
Our negotiator reports that you have rejected the above offer [of $14,500]. This is to advise that unless a favorable acceptance of our offer is received by the Department of Transportation within 14 days from the date of this letter, we will have no other alternative except to assume that settlement by agreement cannot be reached and condemnation proceedings will, as a matter of necessity, be instituted.
Carroll did not respond to this communication, and the State, on October 30, 1987, filed its complaint.
The Law Division judge entered an order on November 10, 1987 providing that $14,500 be paid into court and that the State be entitled to exclusive possession of the subject portion of Carroll's property. An order to show cause was signed by the court on November 16, 1987, with a return date of February 5, 1988, providing that defendants appear and show cause why commissioners should not be appointed "to fix the compensation to be paid for the taking ..., including the damage, if any, resulting from the taking, to any remaining property...." On the return date, the court rescheduled argument after requesting briefs from the parties, and directing that the State negotiate with Carroll regarding the trees.
After oral argument on April 15, 1988, the Law Division judge took the matter under advisement, and on July 20, 1988, he handed down his written opinion. He found that federal regulations required a hearing to be held prior to the widening of the road to six lanes, but that "[t]he consequences of the breach ... do not affect the State's condemnation proceedings. The hearing requirement is a federal requirement, and as such only affects the State's right to receive federal funds." The court in holding that bona fide negotiations had not been completed as required by N.J.S.A. 20:3-6, reasoned that "[n]egotiations cannot be bona fide when (1) a `one price' *43 method is used; (2) an unintelligible and inadequate appraisal is presented to the condemnee; (3) information concerning the impact of noise is not affirmatively provided to him; and (4) neighboring appraisals constituting public records are made inaccessible."

I.
The State argues that it submitted its registered appraisal to defendant and made every effort to explain its position in response to his demands. The State urges that since defendant did not supply any contrary appraisal, it did not need to continue negotiations or change its appraisal or offer.
Defendant Carroll counters that a condemnee is not required to offer any proof to the State regarding the value of the property to be taken, relying on State, By Com'r of Transp. v. Siris, 191 N.J. Super. 261, 269 (Law Div. 1983). Siris dealt with the State's burden under N.J.S.A. 20:3-12(e) to offer proof at the hearing of condemnation commissioners regarding its opinion of proper compensation for condemned property. 191 N.J. Super. at 265. The Siris court found the condemnee had no statutory burden at that hearing to offer proof. Id. at 269.
The requirement that the State negotiate with a condemnee prior to filing a complaint for condemnation is found in N.J.S.A. 20:3-6, which states:
Whenever any condemnor shall have determined to acquire property pursuant to law, including public property already devoted to public purpose, but cannot acquire title thereto or possession thereof by agreement with a prospective condemnee, whether by reason of disagreement concerning the compensation to be paid or for any other cause, the condemnation of such property and the compensation to be paid therefor, and to whom payable, and all matters incidental thereto and arising therefrom shall be governed, ascertained and paid by and in the manner provided by this act; provided, however, that no action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned, setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and *44 such other matters as may be required by the rules. Prior to such offer the taking agency shall appraise said property and the owner shall be given an opportunity to accompany the appraiser during inspection of the property. Such offer shall be served by certified mail. In no event shall such offer be less than the taking agency's approved appraisal of the fair market value of such property. A rejection of said offer or failure to accept the same within the period fixed in written offer, which shall in no case be less than 14 days from the mailing of the offer, shall be conclusive proof of the inability of the condemnor to acquire the property or possession thereof through negotiations. When the holder of the title is unknown, resides out of the State, or for other good cause, the court may dispense with the necessity of such negotiations. Neither the offer nor the refusal thereof shall be evidential in the determination of compensation. [Emphasis supplied].
The statute does not provide for, and we do not consider it to be within the spirit of the statutory plan, to require condemnees to produce data during the negotiation stage to support their contention that the State has undervalued the property. See Monmouth County v. Whispering Woods, 222 N.J. Super. 1, 9 (App.Div. 1987), certif. den., 110 N.J. 175 (1988); State v. Hancock, 208 N.J. Super. 737, 743 (Law Div.), aff'd, 210 N.J. Super. 568 (App.Div. 1985).

II.
The State submits that "the court's ruling below that noise is a compensable item of damage was premature." The State initially notes that
[d]uring negotiations, defendant did not assert that his remaining property would be damaged by additional noise or pollution due to its increased proximity to Route 38. Nor did defendant question why the State did not offer him compensation for noise damage. Also, defendant never requested any information from the State concerning noise in pre-complaint discussions. Hence, the State was never put on notice during negotiations that defendant disagreed with the State's position that his remaining property was not damaged by increased proximity to Route 38. The State cannot be faulted for failing to negotiate on an issue that it did not know was in dispute. Accordingly, the requirements of N.J.S.A. 20:3-6 were not violated.
The Law Division in the present case stated that damages due to increased noise should not be limited to "special" uses, stating:
What is a "special use"? A public use? A private use? An expensive use? An environmentally attractive use? A non-conforming land use? And what is *45 more special than the use of a home? Home, for most of us, is the place to which we always return, physically or emotionally, the setting indelibly fixed in our memories. It is much more than "special"; noise, potentially, can destroy its use. No good reason exists to deny the right of compensation to a homeowner whose property is the subject of a partial taking when the use of the remaining property on which his home is situate is damaged by increased noise. Our present society, as it grows in size and complexity, is constantly and increasingly assaulted by noises of all kinds, noises which can seriously interfere with health, comfort and the enjoyment of property. When the State, by virtue of its power of eminent domain, adds its own assault to those already in place, it should pay compensation as one means of atonement.
The motion judge's ruling on whether information concerning the impact of noise must be affirmatively provided by the State to the condemnee first required his determination as to whether noise impact is a proper element of damage. Therefore, the issue was properly before the court and was not premature.
The trial court found that the State's negotiations are not bona fide when "information concerning the impact of noise is not affirmatively provided to [the condemnee]." A "Final Noise Study" summary and an "Environmental Assessment" were prepared by the New Jersey DOT, Bureau of Environmental Analysis in June 1987. The summary stated, "[a] total of 84 residences and one school recreation area will have a noise impact as a result of the Rt. NJ 38 project." The summary noted that a noise barrier that would provide mitigation for 60 residences was opposed by the municipality, and that "[m]itigation measures at the remaining impacted receptors, 24 residences and one school recreation area, were not deemed feasible from an engineering or economic standpoint and therefore are not recommended." Although the record is not clear that Carroll's home is one of those impacted, the State has not asserted that it is not one of the properties referred to in the noise study.
The noise study was conducted pursuant to 23 C.F.R. 772.1 et seq. (1988), which provides that in federal or federal-aid highway projects, "[t]he highway agency shall determine and analyze expected traffic noise impacts and alternative noise abatement measures to mitigate these impacts, giving weight to the *46 benefits and cost of abatement, and to the overall social, economic and environmental effects." 23 C.F.R. § 772.9(a) (1988). In state projects which are not "federal-aid highway projects," there does not presently appear to be a noise impact study requirement.
Our Supreme Court has stated,
where only a portion of a property is condemned, the measure of damages includes both the value of the portion of land actually taken and the value by which the remaining land has been diminished as a consequence of the partial taking. The diminished value of the remaining property constitutes the severance damages visited upon that property as a result of the taking. [State v. Silver, 92 N.J. 507, 514 (1983)].
See also Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 125 (1958). N.J.S.A. 20:3-29 provides, "[t]he condemnee shall be entitled to compensation for the property, and damages, if any, to any remaining property, together with such additional compensation as provided for herein, or as may be fixed according to law."
No reported case in New Jersey has decided the issue of whether a private landowner, where the property is put to other than institutional use, should be permitted damages for increased noise to his remaining property after a partial condemnation by the State. In State v. Bd. of Ed. of Elizabeth, 116 N.J. Super. 305, 314 (Law Div. 1971), in which the State instituted partial condemnation, the court noted:
In a proper case, such as a taking of institutional property for highway purposes, such as realty on which a church or school is situated, the court would have no hesitation in considering the detrimental effect of increased highway noise on the remaining property, since this is a factor which a prudent investor would consider in evaluating the economic worth of the property. Dennison v. State, 48 Misc.2d 778, 265 N.Y.S.2d 671 (Ct. Cl. 1965).
In County of Ocean v. Landolfo, 132 N.J. Super. 523, 529 (App.Div. 1975), we stated that the availability of compensation for noise and fumes resulting from use by traffic on the portion of the property that was taken "to the land remaining after a partial taking for highway or jughandle uses remains an open question in this State except in special circumstances as when the land affected by the traffic, noise, fumes, and the like, has a *47 special use, such as a school." (Citations omitted). In Landolfo we expressly declined to decide the issue, as "[t]he portion of defendant's land taken and the portion remaining were raw acreage for which no application for subdivision approval had even been made," thus rendering evidence pertaining to damage to the remainder from traffic, noise and fumes "too remote and speculative to warrant reception into evidence...." Id. at 529-30.
Other states are divided on the issue of whether to permit noise damages to the remainder in cases of partial condemnation. Many states permit the property owner in cases of partial condemnation to recover for noise as a damage to the remainder of his property. See Brannon v. State Roads Comm'n., 305 Md. 793, 804, 506 A.2d 634, 640 (1986) (Increased noise is recoverable as damages in partial condemnation.); State, Dept. of Transp. v. Van Willett, 386 So.2d 1023, 1033 (La. Ct. App.), writ. refused, 392 So.2d 692 (La. 1980) ("If noise and vibration due to presence of a road cause diminution to the value of the remainder of property actually taken, severance damages are to be awarded even though such damages are not peculiar to the complaining owner, but rather are suffered by the neighborhood generally." (emphasis in original)); Roman Catholic Bishop of Springfield v. Com., 378 Mass. 381, 387, 392 N.E.2d 829, 832 (1979) (Condemnee whose property taken for drainage easement in connection with highway project entitled to recover for increased noise due to highway traffic.); Board of Transp. v. Brown, 34 N.C. App. 266, 269, 237 S.E.2d 854, 856 (1977), aff'd, 296 N.C. 250, 249 S.E.2d 803 (1978) ("Noise or any other element of damages to the remaining lands is compensable only if it is demonstrably resultant from the use of the particular lands taken."); State Highway Dept. v. Hollywood Baptist Church, 112 Ga. App. 857, 860, 146 S.E.2d 570, 572 (1965) (In partial condemnation noise from highway may be considered as damage to remainder of property if permanent and continuous.); City of Amarillo v. Attebury, 303 S.W.2d 804, 807 (Texas Civ.App. 1957) (Damage due to noise to remainder of *48 property in partial condemnation not "too speculative, conjectural and remote" and a proper measure of damages.)
Certain states, some relying on the principle that the damage suffered by the property owner is no different from that suffered by all others, have determined that damages in the form of noise to the remainder are not compensable. See In re Leas, 5 Ohio App.3d 120, 123, 449 N.E.2d 780, 784 (1981) (Property owner whose property was partially condemned may not recover for dust, vibrations and dirty windows resulting from highway project, as property owner must show that property was taken, and not merely damaged.); City of Lakewood v. DeRoos, 631 P.2d 1140, 1142-43 (Colo.Ct.App. 1981) (Although property owner may be exposed to greater amount of noise due to street expansion for which his property was partially taken, damages not available as adverse effect not different in kind from effect suffered by general population.); Div. of Admin. v. West Palm Beach Garden Club, 352 So.2d 1177, 1180 (Fla. Dist. Ct. App. 1977) (In partial condemnation, "[m]ere highway noise as such, not coupled with a physical invasion or trespass, is not compensable under Florida law."); State, Road Commission v. Williams, 22 Utah 2d 331, 334, 452 P.2d 881, 884 (1969) (In partial condemnation, condemnee not permitted damages for diminution in value of reminder of property due to highway traffic noise.); State v. Galeener, 402 S.W.2d 336, 340 (Mo. 1966) (In partial condemnation noise from traffic not a proper measure of damages to remaining property.).
The most recent New York case to make a statement on this issue held that damages in a partial condemnation for noise to the remainder of the property was recoverable by a high school, as it "had a direct, identifiable, functional interest in quietude, a circumstance which would not exist in every or even most urban properties and which existed here in consequence of the particular use to which the buildings and improvements were being put." City of Yonkers v. State, 40 N.Y.2d 408, 412, 386 N.Y.S.2d 865, 869, 353 N.E.2d 829, 832 (1976). In making its *49 determination the court relied upon Dennison v. State of New York, 22 N.Y.2d 409, 293 N.Y.S.2d 68, 239 N.E.2d 708 (1968), which was the case relied upon by our Law Division in Bd. of Ed. of Elizabeth, 116 N.J. Super. at 314.
We hold that noise damages may be compensable in a condemnation action, and are not restricted to those whose property is put to "special uses." It must, however, be shown that the value of the property remaining is diminished by noise resulting from the taking of the land in question. We choose not to limit recovery only to those takings where the increased noise results directly from the new use of the particular lands taken. Compare Roman Catholic Bishop of Springfield, 392 N.E.2d 829, with Brown, 237 S.E.2d 854.
The State is required to "`disclose its complete appraisal information during pre-litigation negotiations.'" Hancock, 208 N.J. Super. at 742, quoting Siris, 191 N.J. Super. at 268 (emphasis in original). Therefore, the State here had an affirmative obligation to provide the condemnee with noise studies which it had available. The fundamental purpose of N.J.S.A. 20:3-6 was "to encourage entities with condemnation powers to make acquisitions without litigation." Rockaway v. Donofrio, 186 N.J. Super. 344, 353 (App.Div. 1982). N.J.S.A. 20:3-6 requires that during negotiations the State affirmatively make to condemnee "a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated...." We found in Whispering Woods, 222 N.J. Super. at 9 that the State's "failure to supply [the condemnees] with the appraisal and the `manner in which the amount of such offered compensation ha[d] been calculated' prior to commencement of th[e] litigation, constituted such a significant statutory dereliction as to compel dismissal of the complaint." In Whispering Woods this court cited the report by the Eminent Domain Revision Commission, which stated,
Complaints have been made to the Commission that negotiations for acquisition are frequently conducted in an arbitrary manner. The owner is advised merely of the dollar amount of the offer, but is given no information, even if he *50 requests, as to the manner of ascertaining the amount so offered. It is believed that such treatment of a property owner is improper. [Ibid., quoting Report, Eminent Domain Revision Commission, 16-17 (1965)].

III.
The question of whether the condemnee is entitled to have access to his neighbors' appraisals is not properly in issue here. The State has no affirmative duty to provide its appraisals of neighboring properties to the condemnee absent the condemnee's request for those appraisals during the statutorily mandated negotiations period. See N.J.S.A. 20:3-6. Therefore, even assuming appraisals of neighboring properties are discoverable before the filing of the condemnation complaint, only if the condemnee had requested appraisals of neighboring properties during the statutorily mandated negotiations period and the State had refused access could the condemnee claim that the State did not conduct bona fide negotiations. Carroll did not request the appraisals of neighboring properties until almost three months after the State filed a condemnation complaint. Thus, it cannot be said that the State failed to engage in statutorily mandated negotiation in refusing to release the appraisals.
We need not consider at this time the State's claim that such appraisals of other properties are not records which the public has a right to either under N.J.S.A. 47:1A-2 or the common law. The State contends that the privacy and confidentiality interests of the private property owner outweigh the condemnee's interest in the appraisals. However, the Administrative Code provides only that appraisals are not deemed public records "prior to the completion of a project." N.J.A.C. 16:1-2.2(i). We fail to see how the concern for the privacy of a property owner changes with the progress of the State's project. We also decline to decide the issue of the discoverability of such appraisals during the litigation phase of the condemnation process. See R. 4:73-11; but see R. 1:1-2.

*51 IV.
The State has noted that it is particularly aggrieved by the Law Division judge's characterization of the State's "full one price method" approach to negotiations as an inflexible one price policy. This full one price method of making "full offers" at the outset of negotiations is claimed by the State to comply "in all respects with State law and is consistent with federal policy."
The trial court stated in its opinion, "[a]ccording to Carroll the State has a `one price offer' system which requires a negotiator to make an initial offer which may thereafter be raised only twice by specified amounts. The State has not repudiated this claim." The court found that
[a] "one price" policy denies flexibility; fixing the State's position in advance, it makes negotiations in the true sense impossible. The policy, apparently designed to meet the statutory requirement that an offer be made, does not satisfy the further statutory requirement that negotiations take place. The Congressional disapproval of that approach reinforces this conclusion.
N.J.A.C. 16:5-2.5, entitled "Full price offer," provides in relevant part:
(a) It is the policy of the State that negotiation offers shall be on the basis of a full one price method which sum will be verified in writing at the time of offer.
(b) The primary objective of the one full price policy is to protect owners and assure that all are treated fairly and equally. It is intended to make it unnecessary for any owner to have to bargain with the State as a Public Agency before he receives an offer in the full amount established by the State's appraisal documentation.
No regulations have been found which discuss the type of price negotiations which the State may undertake after making its "full price" offer. Carroll alleged in his trial brief, which was sworn to by Carroll at the trial court's request:
Plaintiff conducted purported negotiations with me through staff negotiators. Only recently, through inquiry, have I learned that they had no scope of authority; the only actual function they performed was to attempt to obtain agreements from owners at the one price value and to report to their superiors the objections of unwilling owners. In turn, the superiors were limited by not only the one price policy, but also by an internal policy that settlements would not be made substantially in excess of established fair market value with limits of not more than $1000. by approval of the district supervisor nor $2,000. by the *52 Chief, Bureau of Acquisitions with the concurrence of the Director. These restrictive policies were never explained to me, but more significantly and fundamentally, they establish the fact that even to the extent, if any, that bona fide negotiations were conducted, they concerned a maximum of $2000.
The State contends in its appellate brief,
The State does not have a restriction which only permits its initial offer to be raised twice by specified amounts. The State submits that the Court below was confused by the standards imposed by the Department of Transportation's hierarchy with regard to authority to grant approval for an agreement. A district supervisor has the authority to give approval for a settlement up to $1,000 above the amount of the State's offer. The Chief of the Bureau of Acquisitions in the Division of Right of Way has the authority to give approval for a settlement up to $2,000 above the amount of the State's offer. The Assistant Director and Director of the Division of Right of Way have the authority to give approval for a settlement for any amount above the State's offer. Thus, the State may enter into agreements at amounts well above its initial offer so long as the figure is justified.
While there is nothing in the record to support this assertion by the State, it appears to be a reasonable means of operation for a governmental authority which must strictly control expenditures within the confines of a fixed budget.
The federal policy concerning the price to be paid to condemnees is embodied in 42 U.S.C. § 4651, which provides in relevant part:
Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property.
As noted by the State, the legislative history of the federal provision clearly indicates that the "full fair offering price" policy should not be equated with the "one price" policy. The legislative history indicates that the method involved in the "one price" policy was to obtain two appraisals for each property to be acquired and ordinarily to offer the property owner the higher of the two. This policy was reported to be rigid and inflexible. Offers were made on a "take it or leave it" basis and there were no serious efforts made to resolve reasonable differences of opinion concerning the value of property. H.R. Rep. No. 1656, 91st Cong., 2nd Sess. (1970), U.S.Code Cong. & *53 Admin.News 1970, pp. 5850, 5871-3. The legislative history for the present federal regulation notes that "individual appraisers and appraisals are not infallible, and for that reason [the proposed regulation] places the responsibility on the acquiring agency to determine, in advance of negotiations, an amount which it regards as the fair market value of such property...." Ibid.
N.J.A.C. 16:5-2.5(b) provides only that the offer a condemnee receives from the State for his property is "in the full amount established by the State's appraisal documentation." It does not require that the agency determine in advance of negotiations an amount it regards as the fair market value of the property even if it is different than its "appraisal documentation." The New Jersey Administrative Code thus may not comply with the federal regulation. The State could under N.J.A.C. 16:5-2.5(b) proceed based upon a plainly erroneous appraisal report. N.J.S.A. 20:3-6 appears to provide for the appropriate federal pricing policy, as it states that "[i]n no event shall such offer be less than the taking agency's approved appraisal of the fair market value of such property." We assume that the language "agency's approved appraisal of fair market value" connotes an independent deliberative process by the agency. The federal regulations are made applicable to states for federally-funded projects through 23 C.F.R. 17.5(e). Again, however, a violation of a federal provision would not invalidate the State's condemnation, but only place in jeopardy federal funding.
The trial court found that the State's use of the "one price" policy constituted a violation of N.J.S.A. 20:3-6 as a failure to conduct bona fide negotiations. The definition of negotiate used by the trial court, taken from the compact edition of the Oxford English Dictionary (1971), is "[t]o hold communication or conference (with another) for the purpose of arranging some matter by mutual agreement; to discuss a matter with a view to some settlement or compromise." This does not require that negotiators come to the bargaining table with no restrictions or *54 limits on the scope of permissible settlement. Parties to a negotiation usually have some pre-set determination of how high or low they are willing or authorized to go in bargaining. We cannot say that the State's asserted organizational structure for authorizing settlement offers per se constitutes an inability to engage in bona fide negotiations. Experience reflects that the State, as represented in its brief, does engage beyond the framework of the "full price offer" in further negotiations for the settlement of disputes as to the value of a condemnee's loss.
We are nonetheless convinced that, whether inadvertent or not, in this instance the State did not engage in bona fide negotiations with Carroll. The chronology of events detailed by this court including the letters between the parties amply support this conclusion. Even if the organizational structure and authority within the agency is sufficient to permit bona fide negotiations, it is clear that none took place as to this taking. The September 3, 1987 letter from the DOT tacitly acknowledges that further negotiations were in order, as it concludes that "we are both ready and willing ... to negotiate this taking." However, at the same time, the Bureau of Acquisition of the DOT flatly told Carroll to accept the State's offer within 14 days or face condemnation proceedings.

V.
The State correctly asserts that while "[d]efendant did maintain below that the appraisal failed to explain the valuation methods used, ... defendant never alleged that the appraisal forms were unintelligible." Defendant stated in reference to the appraisal form that it did not explain the valuation methods used, but contained only "a naked statement" that the cost and income approaches will not be used; the comparative approach will be used.
The trial court stated in its opinion that "[t]he appraisal form used by the State, a tortured assemblage of broken paragraphs, *55 does not satisfy either the rules or Hancock." The court concluded that "Carroll's claim that the appraisal is unintelligible and contrary to law is correct; it denies the claim of bona fide negotiations."
We do not agree with the trial court's conclusion that the appraisal was "unintelligible" and that its use by the State negates any claim of bona fide negotiations. The State utilized an appraisal form which allowed for only a certain amount of space for each section. Where the appraiser's remarks were more lengthy than the space provided would permit, a note at the bottom of that section directs the reader to the appropriate page for the remainder of the text. As noted by the State in its brief, this treatment is similar to that given in newspapers or magazines when an article is continued on subsequent pages. While it would be easier to read if the appraisal were produced on a word processor or individually typed, negating the need for forms, the form used by the DOT cannot be said to be unintelligible so as to constitute a lack of bona fide negotiations on the part of the State.
The motion judge did, however, correctly conclude that the State failed to furnish the condemnee with "a statement of the full fair market value including a description of the appraisal valuation method or methods relied upon ... and data concerning comparable sales or leases relied upon in determining the amount of compensation offered...."
The appraisal states that
[t]he Cost and Income Approaches will not be used. The Comparative Approach will be used to estimate the site value[,] [and] [t]he Cost and Income Approaches will not be applied. The Comparative Approach will be used to value the subject site.
This to our view does not constitute a "description of the appraisal valuation method or methods relied upon" as required by R. 4:73-1. The State's argument that providing the comparative appraisals is analogous to a description is not persuasive. Without an accompanying explanation of the comparative approach, *56 the purpose of the inclusion of other appraisals in the appraisal of the condemnee's property is simply not clear.
The Law Division judge relied upon R. 4:73-1 which applies to condemnation complaints that are filed by the State after negotiating pursuant to N.J.S.A. 20:3-6. We have previously looked to the requirements of R. 4:73-1 in determining whether the State has engaged in bona fide negotiations, stating that "[i]n the field of condemnation, `government has an overriding obligation to deal forthrightly and fairly with property owners.'" State by Commissioner of Transp. v. Hancock, 210 N.J. Super. 568, 569-70 (App.Div. 1985), quoting F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426 (1985). Thus, a description of the appraisal method used should be furnished to the condemnee during negotiations as a basis from which to proceed. The State's failure, during the negotiation period, to provide a description of the comparative approach of valuation used constitutes a violation of N.J.S.A. 20:3-6.
The order dismissing the complaint is affirmed.