759 A.2d 1247 (2000)
334 N.J. Super. 473
CASINO REINVESTMENT DEVELOPMENT AUTHORITY, a public corporate body of the State of New Jersey, Plaintiff,
v.
Samuel KATZ, Solomon Katz and Harry Katz, a co-partnership t/a Somerset Realty Company, First National State Bank/Edison, Josefa Mendez and Rushel Mendez, Herzfeld & Stern, Great Bay Hotel and Casino, Mustafa I. Najjar, Public Service Electric and Gas Co., Atlantic City Linen Supply, Inc., State of New Jersey, City of Atlantic City, Atlantic City Sewerage Company, and Atlantic City Municipal Utilities Authority, Defendants.
Casino Reinvestment Development Authority, a public corporate body of the State of New Jersey, Plaintiff,
v.
Andover Realty Company, a New Jersey partnership, Atlantic City Linen Supply, Inc., State of New Jersey, City of Atlantic City, Atlantic City Sewerage Company, and Atlantic City Municipal Utilities Authority, Defendants.
Superior Court of New Jersey, Law Division, Atlantic County.
Decided July 13, 2000.
*1248 James P. Rhatican, Connelly Foley, Roseland, Attys. for Plaintiff.
Willis F. Flower, Ford Flower & Hasbrouck, Ocean City, and John Buonocore, McKirdy & Riskin, Morristown, Attys. for Defendants.
WINKELSTEIN, A.J.S.C.
The Casino Reinvestment Development Authority (CRDA) has filed two Verified Complaints and Orders To Show Cause seeking to acquire commercial property located in Block RS-69, Lots 9, 10, 11, and 12 on the Atlantic City Tax Map, commonly known as 436, 430, 418, and 416 N. North Carolina Avenue, Atlantic City (collectively "the property") to be used to widen and improve North Carolina Avenue. Lots 10, 11 and 12 are owned by a partnership known as Somerset Realty while Lot 9 is owned by another partnership, Andover Realty. The partnerships are primarily comprised of the same principals and the two actions have been consolidated *1249 for purposes of this proceeding. CRDA seeks an order from the court authorizing it to exercise its power of eminent domain and for the appointment of condemnation commissioners. Defendants oppose the application and seek dismissal of the complaint.
When appraising the property under the income capitalization approach to value, CRDA's appraiser did not consider the actual rental history of the property as a factor in arriving at the property's value. The issue to be decided, which is one of first impression, is whether the condemning authority's failure to use the actual rents from the property in arriving at fair market value, and subsequent refusal to reconsider the appraised value taking the actual rents into consideration, equates to a failure by CRDA to negotiate in good faith and warrants dismissal of the complaint.
On July 29, 1998, CRDA first advised defendants of its intention to acquire the property and offered $155,000 for Lot 9 and $470,000 for Lots 10, 11, and 12. The offers were based upon appraisals prepared by Jay McHale and Associates, Inc. dated June 12, 1997. The property values were determined by utilizing the income capitalization approach which, in its simplest terms, converts anticipated revenues from the property into a value estimate. This approach has been defined as:
[A]n approach through which an appraiser derives a value indication for income producing property by converting anticipated benefits, i.e., cash flow and rents, into property value. The conversion can be accomplished in two ways: first, one year's income expectancy or an annual average of several years' income expectancies may be capitalized at a market derived capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment. Secondly, the annual cash flow may be discounted for the holding period and the reversion at a specified yield rate.
[7A Nichols on Eminent Domain § 9A.04 [1][c][iii], (rev. 3rd ed.1982), citing the Dictionary of Real Estate Appraisal, 1156 (Am. Inst. of Real Est. Appraisers, 2d ed.1989).]
On August 7, 1998, Samuel Katz, a partner and co-owner of the property who is now deceased, spoke with Daniel Saul, CRDA's project development officer, concerning his disagreement with the CRDA property valuations. Katz contended that the valuations did not take into account the actual rents being generated by long term leases on the property. Saul acknowledged the objections to the offer and thereafter discussions ensued between Katz and Saul, but CRDA did not take any action to reappraise the property using the actual rents nor did CRDA increase its offer to purchase.
CRDA did not immediately move to take the property. There is a tenant on the property, a laundry company, Atlantic City Linen (A.C.Linen), which needs to be relocated. It was not until December 1999, over a year after the initial discussions and two and one-half years after the property was appraised, that CRDA decided to move forward to acquire the property. At that time Saul wrote to counsel for the property owners advising them of CRDA's intent to proceed with the acquisition of the property. On December 23 counsel for the property owners wrote to Saul and again requested that CRDA meet with the property owners to discuss the valuation of the property. Defendants continued to take the position that CRDA's appraisal undervalued the property since it failed to consider the actual rents generated by the property of approximately $6 sq/ft. CRDA maintained its position that it was not necessary to use the actual rents as an element in arriving at market rent, and it declined to reappraise the property or increase its offer. No agreement was reached. The condemnation complaint was filed on April 14, 2000.
*1250 Each of the subject lots is 50' wide and 155' deep. The lots are improved to 100% coverage, with contiguous and interconnected masonry buildings totaling 31,000 square feet which house A.C.Linen. The laundry operation occupies 100% of the structures for its laundry which services various local businesses and casinos. The tenant is the owner of additional contiguous improved property which is employed in its operations. CRDA and A.C. Linen have apparently negotiated an agreement which will leave A.C. Linen in possession, open and operating, until the relocation facility is ready for occupancy. During this time period CRDA will receive the rental income.
Although the lots are held by two different partnerships and are occupied under two separate leases with A.C. Linen, the terms of the leases and the rents due under both leases were negotiated together and essentially equate to the same dollar amount per square foot. Lots 10, 11, and 12 are presently occupied under a lease between Somerset Realty Company and A.C. Linen (the Somerset lease), while Lot 9 is occupied under a lease with Andover Realty Company (the Andover lease). The initial term of the Somerset lease was for ten years commencing January 1, 1990 and included an option to renew for five years, from January 1, 2000 through December 31, 2004. By amendment dated June 7, 1991, the tenant could extend the option terms to December 31, 2014. The rent established in the Somerset lease was $8,912.50 per month subject to a consumer price index increase each year commencing July 1, 1991 and each year thereafter during the term of the lease. The rent payable from 1997 (the year the CRDA appraisal was completed) to 1999 was $125,169.09 for 1997, $133,371.12 for 1998, and $136,572.00 for 1999. For the Andover lease, which had an initial term plus three five year renewal options extending through December 31, 2014, the rent was $41,723.04 for 1997, $44,440.04 for 1998, and $45,510.72 for 1999. The tenant has exercised its option to renew the lease for the term ending in 2004. According to the appraisal reports, the property had historically been tenant occupied, and at the time of the appraisal the lease agreement generated yearly rent equating to $5.38 sq/ft. With the exception of structural maintenance, all expenses were the responsibility of the lessee. All parties agree that the lease has favorable rental terms for the property owners when compared to other rental properties in the area.
The parties raised issues in their briefs concerning whether the discussions between Katz and Saul centered around A.C. Linen's relocation or the valuation of the property. The parties agreed at oral argument, however, that no plenary hearing is necessary to address these issues, since defendants' position is that regardless of the nature of the discussions, CRDA did not engage in bona fide negotiations with the property owners because its offers to purchase were based on hypothetical market rents without regard to the actual rents paid by the tenants, and therefore the appraisals did not reflect the property's full market value. In other words, the property owners assert that because no consideration was given to the rents actually being generated by the Somerset and Andover leases, the offers to purchase, which were based upon the appraised values, were flawed, and do not represent good faith full-price offers.
There is a separate appraisal report for each property, but each report contains essentially the same information and analysis. When determining what methodology to use to arrive at fair market value, the CRDA appraiser stated:
The first step of the Direct Capitalization Method is to develop an estimate of the property's potential income producing capabilities for a stabilized year. As previously discussed, this appraisal comprises the unencumbered fee simple interest. Thus, the stabilized annual income of the subject property comprises market rent, which has been estimated *1251 through a survey and analysis of rents being obtained in other comparable facilities within the general market area.
[Andover/Somerset Appraisals, June 12, 1997 at p. 19.]
The CRDA appraiser summarized the rents for various other commercial properties. Id. at 23. Included in the appraisal report as a comparable rental for the Andover property was the rent on the Somerset property, while the report for the Somerset property included the Andover property as a comparable rental property; neither appraisal, however, included the subject property's actual rents.
The Andover report states that:
The surveyed rental information indicates a rental range from $2.78/sf to $5.38/sf for older industrial buildings. The chosen comparable rental information and other information collected during the research indicated that the typical lease is structured on a net basis where the tenant is responsible for most expenses. Additional industrial lease data located in nearby municipalities was also reviewed.
...
Based on the market rental information, the market rent has been stabilized at $3.00/sf on a net basis, where most expenses are incurred by the tenant. Thus, the annual potential gross income is estimated at $23,300.
...
The income capitalization approach was also considered and developed, since this type of property is often attractive to investors within the market. An adequate supply of comparable rental information was revealed and a market value estimate was developed on a stabilized basis for the subject. This approach to value has been given the most weight, since the subject property would be attractive to market participants as an income producing property.
[Andover Appraisal, Id., at 24, 45.]
The appraiser did not include any details concerning how the $3 sq/ft market rent for the Andover property was computed, but the data used to arrive at the $3 sq/ft did not include the Andover rent. Using $3 sq/ft as a basis, the appraiser arrived at an estimated market value of $155,000 for the Andover property.
For the Somerset property the annual income equaled $5.38 sq/ft. The appraiser's comments concerning the lease and his methodology to arrive at value were essentially the same as those he made with respect to the Andover lease. Based on comparable rentals, without regard to the property's actual rents, the appraiser concluded that the potential gross income for the Somerset property was $69,800 and after the income was capitalized, the fair market value was established at $470,000.
On these facts defendants argue that CRDA, by failing to consider the property's actual rents as an element in arriving at market value, failed to negotiate in good faith. Defendants assert that CRDA's offer, calculated without factoring in the rents the property owners will lose when the property is taken, does not reflect full market value. CRDA has taken the position that it should be left up to the condemnation commissioners, or ultimately a jury, to determine if the actual rents from the property should have been an element in arriving at value, and CRDA need not increase its offer at this time.
N.J.S.A. 20:3-6 provides in pertinent part:
[N]o action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor to the prospective condemnee... setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which *1252 the amount of such offered compensation has been calculated...
The importance of the process of bona fide negotiations is well settled. State by Com'r of Transportation v. D'Onofrio, 235 N.J.Super. 348, 562 A.2d 267 (Law Div.1989); State v. Hancock, 208 N.J.Super. 737, 506 A.2d 855 (Law Div. 1985), aff'd 210 N.J.Super. 568, 510 A.2d 278 (App.Div.1985). The purpose of N.J.S.A. 20:3-6 is to encourage acquisitions without litigation, thus saving both the acquiring entity and the condemnee the expense and delay of litigation. This policy permits the landowner to receive and keep full compensation. Borough of Rockaway v. Donofrio, 186 N.J.Super. 344, 354, 452 A.2d 694 (App.Div.1982). Compliance with the prelitigation requirements of the statute is jurisdictional, and failure of the condemnor to comply with the prelitigation requirements will result in dismissal of the complaint. Id.
In Rockaway, plaintiff municipality filed an action to condemn defendants' property for street improvements. Defendants argued that plaintiff did not comply with N.J.S.A. 20:3-6 because defendants were not provided the opportunity to accompany the appraiser to the property. The trial judge allowed plaintiff to attempt to cure the defect without dismissing the action and stayed the case pending appointment by plaintiff of a new appraiser. The appellate court reversed, ruling that the plaintiff's action should have been dismissed for non-compliance with N.J.S.A. 20:3-6. The court held that the Eminent Domain Act of 1971 should be strictly construed:
To foster amicable adjustment and thereby reduce litigation, the statute shall require that before proceedings are instituted, the condemning body shall conduct bona fide negotiations with the owners, through fair offers of compensation, including a reasonable disclosure of the manner of arriving at the offer. (emphasis added)
[Rockaway, supra, 186 N.J.Super. at 350, 452 A.2d 694.]
The court reasoned that had plaintiff complied with the statute, defendants may have had a better understanding why their property was being taken, what would be built and possibly avoid any misunderstandings that may have been presented. Id. at 354, 452 A.2d 694. Even though plaintiff sought to appoint a new appraiser so that defendants would have an opportunity to accompany him to the property, plaintiff did not comply with the statute, and its complaint was dismissed. Id. See also State, by Com'r of Transportation v. D'Onofrio, supra, (reasonable disclosure of all appraisals in the condemning authority's possession is an element of bona fide negotiations).
In Morris County v. Weiner, 222 N.J.Super. 560, 537 A.2d 752 (App.Div. 1988), certif. denied, 111 N.J. 573, 546 A.2d 501 (1988), the condemning agency wrote a letter to defendants expressing its desire to acquire the property, stating that defendants should contact plaintiff to negotiate. Defendants' counsel contacted plaintiff, rejecting plaintiff's offer, arguing that there had been a recent extension of bank mortgage financing on the subject property and a recent contract for sale which included a sales price well in excess of the amount the condemning agency was willing to offer. Plaintiff did not have its appraiser consider these additional facts but instead filed suit. The trial court dismissed plaintiff's complaint. The Appellate Division affirmed and stated:
The purpose of the statute is to encourage public entities to acquire property without litigation where possible, thereby saving both the public and the condemnee the expense and delay of court action and permitting the condemnee to receive and keep the full compensation due him. Rockaway v. Donofrio, 186 N.J.Super. 344, 353-354, 452 A.2d 694 (App.Div.1982)....
...
Upon receiving defendant's advice ... it was incumbent upon plaintiff to ask how *1253 it was conceivable for a bank to lend $400,000 on the security of a property which plaintiff had appraised at only $255,000. Its action instituting condemnation proceedings immediately upon receipt of defendants' response was incompatible with its obligation to negotiate.
[Id. at 565, 537 A.2d 752.]
The question of whether a condemning authority can make a one-price offer was addressed in State. by Com'r of Transp. v. Carroll, 123 N.J. 308, 587 A.2d 260 (1991). The Department of Transportation (DOT) sought to expand Route 38 and needed to purchase part of defendants' property. The DOT offered one price to defendants; it did not deviate from its appraised value. After defendants refused to negotiate, plaintiff filed a complaint. Defendants argued that the State violated its duty to negotiate because it offered one price to defendants and did not increase the offer through negotiations. The Court held that a one-price offer did not per se violate the bona fide negotiations requirement of the Eminent Domain Act, since a condemning authority is obligated to make its best offer before litigation is instituted. Id. at 318, 587 A.2d 260. "The objective of requiring an initial full-price offer is to prevent the State from making low offers to gain a bargaining advantage.... The one price procedure assures that the property owner will obtain no less than the State's genuine determination of the fair market value of the property taken." Id.
The high Court did not discuss the extent of the condemning authority's obligations to negotiate after the full-price offer was made, but the Appellate Division did. State, by Com'r of Transp. v. Carroll, 234 N.J.Super. 37, 559 A.2d 1381 (App.Div. 1989). The allegation by the property owner in Carroll was that the State's procedures for increasing its offer by way of negotiations did not amount to bona fide negotiations. The State's organizational structure authorized increased settlement offers in increments. The State negotiated through staff negotiators with limited authority. When they determined how much the property owner wanted, the negotiators would report to their superiors, who had authority to increase the offer by not more than $1,000. The district supervisor had an additional $2,000 in authority. After the district supervisor, there were others in State government who could approve settlements for any amount above the State's initial offer. The Appellate Division did not consider the State's procedure to be tantamount to a take it or leave it position. Id. at 53, 559 A.2d 1381.[1] Citing to the Oxford English Dictionary (1971) which defined the term "negotiate" to include "... to discuss a matter with a view to some settlement or compromise," the court found that the State's organizational structure did not per se constitute an inability to engage in bona fide negotiations, since the State engaged in negotiations beyond the initial full price offer in an effort to settle disputes as to the value of a condemnee's loss before suit was filed. Id. at 53-54, 559 A.2d 1381. Said a different way, the Appellate Division concluded that the State was required to make its best offer up front, and thereafter to continue to negotiate with the property owners to consider any omissions or defects in the appraisal before suit was filed. Since the State's procedure allowed for this prelitigation process, the State prevailed on appeal.
CRDA is authorized to acquire property pursuant to the Eminent Domain Act, N.J.S.A. 5:12-182, which incorporates the bona fide negotiations provisions of N.J.S.A. 20:3-6. It must make an initial offer of full value and then continue to negotiate in an effort to settle the matter *1254 before litigation is instituted. Did CRDA meet this obligation? Did the failure to include the actual rent generated by the property as a factor in arriving at the initial offer mean that the offer was not a full-price offer, and by failing to consider an adjustment, did CRDA fail to satisfy its obligation to engage in bona fide negotiations?
In defining fair market value for purposes of condemnation, our Supreme Court has found that:
[M]ost things have a general demand which give them a value transferrable from one element to another. Ordinarily, this transferrable value may be measured by the price which, in all probability, would voluntarily be agreed upon in fair negotiations between an owner willing (but not forced) to sell and a buyer willing (but not force) to buy...(citations omitted).
[Village of South Orange v. Alden Corp., 71 N.J. 362, 368, 365 A.2d 469 (1976) ].
It has long been the rule that just compensation is paid for the property owner's loss, not what the condemning authority gains. State v. William G. Rohrer, Inc., 80 N.J. 462, 467, 404 A.2d 29 (1979).
[T]he just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not the condemnor. Nichols, Eminent Domain § 12.21 at 12-86.1 (3rd Ed.1978).
Furthermore, `compensation' ... implies full indemnity to the owner ... Id., § 12.1[4] at 12-43.
[Id.]
This principle is well established. 1A Nichols on Eminent Domain, supra, 1A.03[2] at 1A-136, citing Ruckelshaus v. Monsanto, 467 U.S., 986, 1013, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), Omnia Commercial v. U.S., 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923), U.S. v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945) and Kimball Laundry v. U.S., 338 U.S. 1, 5-6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), among others; and see also People v. Lynbar, Inc., 253 Cal.App.2d 870, 880, 62 Cal.Rptr. 320 (Cal.Ct. App.1967) (the owner must be placed in as good a position monetarily as the owner would have occupied had the property not been taken, since what is to be valued for taking purposes is what the involuntary sellers have to sell, rather than what the public buyer seeks to acquire). Id. The court goes on to state that:
....market value is the highest price which the property would bring, if exposed for sale in the open market by a willing seller to a willing buyer with both parties to the transaction being fully informed of all uses, and purposes to which the property is reasonably adaptable and available.... [T]his very valuable leasehold is one of the things which such a buyer and seller would consider in the open market in fixing the price at which the ownership of the property would be transferred.
[People v. Lynbar, Inc. at 880, 62 Cal.Rptr. 320.]
"[T]he income generated by a property has been held to be generally the surest indicator of its value for purposes of eminent domain." 7A Nichols on Eminent Domain. Sec 9A.04 [1][c][iii], supra. (citations omitted) Actual income from property is generally accepted as an element to be considered in determining value. 4 Nichols on Eminent Domain, supra., Sec. 12B.08[1] at 12B-50. In assessing the earning power of a property, income is estimated using the income and expense history of the subject property. The Appraisal of Real Estate, (Appraisal Institute 11th ed.) at 482.
In this case the appraiser did not consider the actual rents from the property as an element when he arrived at fair market value. The appraiser considered only hypothetical comparable rents. I recognize that the property's actual rent *1255 and income history should not be the sole basis upon which to determine market rent subject to capitalization, but the cited authority is clear that it must be a factor. By failing to consider the actual rental history of the property, the appraiser's value did not reflect the actual loss to the property owner. The property owner was not placed in as good a position monetarily as the owner would have occupied had the property not been taken. In an arm's length transaction, a potential purchaser of the property would certainly consider the long term lease, which extends through 2014, with its favorable rents. The appraiser recognized that the subject property would be attractive to market participants as an income producing property, see Andover/Somerset Appraisal Reports, supra at 19, but failed to consider the income generated by the property in arriving at a value.
CRDA cites to New Brunswick v. State of N.J. Division of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963), a local property tax case, for the position that New Jersey does not require actual rents generated by the property to be considered in determining what rents should ultimately be capitalized to establish value. New Brunswick states that fair rental value, rather than actual rents payable on an existing lease, control for purposes of local property taxes. Id. at 544, 189 A.2d 702. The Court found that "the valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners. Adjacent properties of equal potential cannot be assessed differently because one proprietor was more or less astute than the other." Id. Other cases involving valuations for purposes of local property taxes come to similar conclusions. See Glenpointe Associates v. Tp. of Teaneck, 10 N.J.Tax 288, (N.J.Tax 1988) (for tax assessment purposes, valuations must have some permanency rendering it secure against temporary conditions such as inflation or deflation); and Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 163, 65 A.2d 828 (1949) (changed economic conditions don't necessarily justify an increase or decrease in valuation). Yet, valuing property for local property taxes is vastly different than valuing property which is unwillingly taken from a private owner for public purposes. The need for permanency that exists for property tax assessments does not carry the same weight when property is valued for condemnation purposes, where full indemnification of the property owner, not a stable tax base, is the goal. If the owner is to be fully indemnified, actual rents must be considered. The analogy to valuation for local property taxes is misplaced.
CRDA has argued that the failure of the appraiser to use the subject property's actual rents in arriving at fair market value is not fatal, that the property owner will have an opportunity to have its own appraiser value the property using the actual rents, and the condemnation commissioners, or a jury, will decide which value to accept. Such a position is contrary, however, to established principles that require full-offers to be made up front to eliminate the need for litigation in the first instance. At the prelitigation stage of eminent domain proceedings it is up to the condemning authority to offer the full, fair value of the property, and if the offer is not acceptable, to continue to negotiate with the property owner to try to find a compromise before suit is filed. CRDA's failure to consider the actual rents as an element for purposes of valuation does not fully compensate the property owner for the loss of the property; rather, it represents a failure to offer the property owner full value before suit is instituted, which is fatal to the condemning authority's offer to purchase. As such, CRDA has failed to comply with its obligation to engage in bona fide negotiations with the condemnee. This failure cannot be cured at a subsequent time. The complaint is dismissed.
NOTES
[1] A take it or leave it position was specifically rejected in Morris County v. Weiner.

To say that the law requires no more than that a condemning authority make an offer and state a time period for an acceptance or rejection would simply eviscerate the bona fide negotiations requirement from the statute.
[222 N.J.Super. at 566, 537 A.2d 752.]