208 N.J. Super. 737 (1985)
506 A.2d 855
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF,
v.
H. EDWARD HANCOCK AND WALTER W. HANCOCK, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided August 29, 1985.
*738 John J. Franzini for plaintiff (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
S. David Brandt for defendants (Brandt, Haughey, Penberthy, Lewis & Hyland, attorney).
HAINES, A.J.S.C.
Our condemnation statute, N.J.S.A. 20:3-6, provides that
... no action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned, setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated. ...
[Emphasis supplied]
Defendant Hancock claims that the State has failed to comply with these requirements. This opinion agrees with that contention and sustains an objection to the appointment of condemnation commissioners.
This matter does not involve substantial money. The State's offer of compensation totals $9550. The fact that the amount is modest highlights the significance of the principle involved. The statutory requirements of "bona fide negotiations" and "reasonable disclosure" are particularly important when minor property interests are being acquired by an exercise of the power of eminent domain. Condemnees subject to these takings can ill afford to hire attorneys and appraisers whose fees are not recoverable in a condemnation proceeding (except in circumstances not relevant here). They must be given every assurance that their government, spending, in part, their money, is treating them with absolute candor and fairness. Such assurance can be provided only if the government, when undertaking negotiations, fully discloses all of the information upon which it relies in making its offer. How else can its negotiations be "bona fide"?
*739 In the present case Hancock hired an attorney but has not incurred the expense of an appraisal. The taking is partial, requiring payment of fair market value for the land taken plus damages caused to the remaining portion. The State's appraiser has advised counsel for Hancock (1) that the $9550 offer represents $4700 for the land taken and $4850 for damages to the remainder, and (2) as the locations, dates and amounts of the three comparable sales used to establish these figures, the names of the buyers and sellers involved in each and the recording data for the deeds delivered. The appraiser has also provided the attorney with a "confirmation of offer letter," said by the State to detail the valuation methods used in its appraisal. The attorney's request for a copy of the State's appraisal was refused.
The "confirmation of offer" letter, after identifying the property, states in full the following:
Confirming my personal negotiations discussion with you of today, the State has had your property appraised so as to estimate the offer of compensation to be paid to you for the land to be acquired and all legal compensable damages to any remainder.
For your analysis and to assist you in a better understanding of the value offer, the following is a summary of the total amount offered as just compensation without prejudice:

 1. Value of all property in the taking
 area $4700 -0- $4700
 _____
 Land Improvements Total
 2. Loss of value (damages) to remaining property outside
 the taking area $4850
 _____
 Total estimate of just compensation for property
 taken and damages, if applicable $9550
 _____

Before initiating these negotiations, careful property inspections were accomplished at which time you were provided an opportunity to accompany the appraisers on their inspection of your property in accordance with the provisions of the Eminent Domain Act of the State of New Jersey. One or more appraisal reports were secured from professional appraisers who considered the Market sales, Income and Cost approaches to value. The appraisals were then *740 reviewed by a reviewing appraiser specialist who, after also personally inspecting your property and then considering the total available information and the above mentioned appraisal methods, established the appraised fair market value estimate as being the State's opinion of just compensation and registered same in the Transportation Department Headquarters in Trenton as the offer to be made to you.
The proposed taking is as indicated on the attached map we mutually reviewed. It is (partial) and in fee or such lesser interests as are shown on the map. The following improvements are considered to be realty and having been evaluated as such, they are to be acquired by the State:
None
It is trusted that you will find this meets with your approval and that an amicable agreement mutually satisfactory will be achieved. I am available for further discussion or to assist as requested.
 Frank A. Jarnecki 9-12-84
 Right of Way Negotiator
This is not an informative document. Its self-serving references to "careful property inspections," "professional appraisers" and "a reviewing appraiser specialist," without any supporting facts, are salesmen's ploys. The representation that "Market sales, Income and Cost approaches to value" were considered is apparently incorrect. The representation to counsel was that only comparable sales were considered.
The information provided by the State, verbally and in writing, falls far short of satisfying the statute. The use of comparable sales for appraisal purposes invariably involves the adjustment of the sales figures in order to make them comparable. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 330-331. Adjustments, which depend upon different factors, such as time of sale, distance from the property taken, and financing terms, may increase or decrease these figures and are based upon the frequently differing opinions of experts. Despite the fact that adjustments made or not made by the State's appraiser significantly affect the validity of the offer, no information concerning adjustments has been provided to Hancock or his attorney. The State's appraisal would have supplied this information and more. Without it, neither Hancock nor his attorney had any meaningful way to check the validity of the State's figures. *741 They could not, for example, perform the most elementary check: adding, subtracting and multiplying figures to insure arithmetical accuracy. They could not test the validity of the verbal information supplied by the appraiser. They had no way to know whether the final figures were affected by mistakes of any kind or by unexpected appraisal techniques or approaches. They do not know, now that litigation has commenced, whether the appraisal used for pre-litigation purposes differs from the appraisal to be relied upon at the commissioner's hearing, if one is held. Nothing in the statutes prevents the State from obtaining a new appraisal for that purpose.
Nothing that is said here is intended to suggest that the State acts other than honorably with respect to its condemnation undertakings. The opposite is expected and assumed. But that is not enough. The State cannot expect to be trusted simply because it is the State. History has shown us too often that governments, sometimes deliberately, sometimes innocently and sometimes from a misguided sense of mission, are not always trustworthy. Consequently, the State has an everpresent obligation, not only to be, but to appear to be, trustworthy. That appearance is absent when the State refuses, as here, to act openly. That refusal engenders distrust and suspicion, diminishing or eliminating any likelihood that the State's offer will be accepted.
The State's contrary philosophy is based upon the following argument taken from its brief:
There is a need to strike a balance in these cases between protecting the public fisc and providing a prospective condemnee with enough information to make a determination whether the State has made an acceptable offer of compensation. Requiring the State to furnish its appraisal during pre-litigation negotiations gives the prospective condemnee the opportunity to structure a reactive appraisal and thereby to possibly prolong litigation by seeking an excessive award.
The argument makes no sense. Why shouldn't the condemnee "structure a reactive appraisal"? That is the right of every person whose property is condemned. Isn't that more likely to happen when the State refuses complete disclosure? If it does, *742 will the condemnee's appraisal necessarily hinder, rather than help, a settlement? The State's contentions run backward. It is the suspicions raised by its insistence upon secrecy which make the "reactive appraisal" likely. The property owner has no other satisfactory way to test the fairness of the offer received.
This court, in State v. Siris, 191 N.J. Super. 261 (Law Div. 1983), said: "My reading of the statute requires the State to disclose its complete appraisal information during pre-litigation negotiations." Id. at 268. That was dicta, since the question in Siris was whether the State had to disclose its appraisal at the commissioner's hearing. Here, that dicta becomes decision. Siris interpreted the Eminent Domain Act in the light of history, language and logic, finding that all of them required the State to make full disclosure of its appraisal information at the commissioner's hearing. The analysis, which applies with equal force to prelitigation negotiations, need not be repeated here, but the following illustrative quotation is apropos:
The State must undertake all of the actions required by (the Eminent Domain Act) in a way fairly calculated to produce "just compensation." Its obligation to its citizens, which it represents, is to be open in all of its dealings. Nothing less will produce a fair result, understood and accepted as such by all involved. No sound reason supports the right of the State to shroud its valuation approaches in secrecy when condemning property. Secrecy is as contrary to the interests of the citizens who pay the cost of condemnation as it is to those whose property is condemned. Full disclosure by the State, the taker, is the intention of the Legislature. The thread of that philosophy runs through the history, the language and the logic of our condemnation statutes. [Id. at 266]
Two prior reported opinions have addressed the present issue. The first is State v. Meisler, 128 N.J. Super. 307 (Law Div. 1974), which held that N.J.S.A. 20:3-6 did not require the State to furnish its appraisal to a condemnee in order to comply with the statute's provisions. It found that an offer which disclosed the taking-damage figures and the method of calculating them was sufficient. I disagree with those conclusions (as I did in Siris) for the reasons expressed here.
*743 The second reported opinion is State v. Rowland, 183 N.J. Super. 558 (Law Div. 1982), in which the court agreed with Meisler. It held:
Concerning the negotiations disclosure and specifications required under N.J.S.A. 20:3-6, as interpreted by the Meisler court, NJDOT was in full compliance. The offer was broken down into monetary figures for land and improvements (the building and fence). The three appraisal methodologies were disclosed. This is all that the statute requires under negotiations. [at 571; footnote omitted]
This conclusion, like the conclusion in Meisler, failed to consider the analysis made here. It is not acceptable. Rowland also discussed the meaning of "negotiations" in the statute. It found that the "give and take" aspect of that term, as used in the marketplace, did not apply in condemnation cases. One reason was that "one of the parties, in this case NJDOT, can only make one offer  its best, at the outset." Id. at 568.
Our statute need not be so read. N.J.S.A. 20:3-6 states only that: "In no event shall such offer be less than the taking agency's approved appraisal of the fair market value of such property. A rejection of said offer or failure to accept the same within the period fixed in written offer ... shall be conclusive proof of the inability of the condemnor to acquire the property or possession thereof through negotiations." An offer higher than the appraisal is not prohibited and may well be appropriate in the course of "bona fide negotiations." The State can be educated during such negotiations. It may learn that its comparable sales are not the best available, that its calculations are incorrect, that its survey is badly done, that it has overlooked important information. It must remember that its appraisal is an opinion, not a fact. Were the State limited to its first offer there could be no negotiations as required by any reasonable interpretation of that term. The State, of course, may conclude that its first offer should not be changed, but may do so only after it has negotiated in good faith. It is then, and then only, that the State can make the offer, changed or unchanged, the rejection of which is "conclusive proof of the *744 inability of the condemnor to acquire the property ... through negotiations."
The State suggests that N.J.S.A. 20:3-12 requires a different conclusion. It directs the parties to exchange lists of the comparable sales to be introduced at the commissioner's hearing at least 15 days before the hearing date. R. 4:73-11 has the same requirement. It is therefore argued that a pre-litigation delivery of the State's appraisal would be contrary to the intent of these provisions. This does not follow. The State exposed its comparables to the condemnee in the present case, apparently unconcerned about this theory. There can be no "exchange" of appraisals at the negotiation stage when the condemnee has no appraisal, the usual circumstance. In fact, the statute and the rule simply provide assurance that the parties will disclose the comparables they intend to use at the commissioner's hearing to prevent the use of information not disclosed during negotiations and therefore presented without notice.
Finally, the State suggests that a proposed rule amendment drafted by the Supreme Court Committee on Civil Practice properly describes the disclosure requirements to which it is presently subject. There are several answers to this contention. In the first place, the proposed rule has not been adopted. If it were, it would not deal with pre-litigation requirements. They are established by the Legislature, not the court. Even so, the disclosure requirements of the proposed rule are very broad. They demand: a map and property description, identification of improvements, a "statement of the full fair market value including a description of the appraisal valuation method or methods relied upon as well as as breakdown of the appraised value allocated to the land to be acquired," comparable sales data and "any unusual factors known to the condemnor which may affect value." This information must be included in the condemnation complaint. The rule may be read as requiring full disclosure so that trial surprises, which our rules are designed to prevent, do not occur. There is no reason to impose any lesser requirements at the point of negotiation, a point at *745 which many of these cases are resolved and are more likely to be resolved if the State makes a truly "full disclosure."
For all of these reasons the commissioners will not be appointed. Strictly speaking, the complaint should be dismissed since it should not have been filed until "bona fide negotiations" had been completed. Defendants, however, have asked only for a discharge of the order to show cause why commissioners should not be appointed. The obligation to ask for more is upon them.