215 N.J. Super. 318 (1987)
521 A.2d 1307
NEW JERSEY HOUSING AND MORTGAGE FINANCE AGENCY, A BODY CORPORATE AND POLITIC, PLAINTIFF-APPELLANT,
v.
DELLA MOSES, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 1987.
Decided February 20, 1987.
*320 Before Judges ANTELL, BRODY and LONG.
Thomas H. Shar, Deputy Attorney General, argued the cause for appellant (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael R. Clancy, Deputy Attorney General, of counsel, and Thomas H. Shar on the brief).
Edward D. McKirdy argued the cause for respondents (McKirdy and Riskin, attorneys; Edward D. McKirdy on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
Plaintiff appeals from seven judgments variously dated March 21, March 26 and March 31, 1986 dismissing its complaints in condemnation. The cases present common questions of law and fact and on April 17, 1986 we consolidated the appeals for all purposes.
On October 4, 1984 plaintiff agreed to finance the purchase by New Community Manor Housing Corporation of a 3.3 acre tract of land on the corner of South Orange Avenue and Bergen Street in the City of Newark. The property was to be developed as a shopping center with most of the space therein to be leased to the Pathmark Corporation, a private business concern, as a supermarket. The proposed shopping center was to be located in the vicinity of New Community's redevelopment area. Ten housing developments financed by plaintiff were located *321 within one-half mile of the 3.3 acre site of the shopping center, and 93,600 people resided within one mile of the site.
Plaintiff determined that successful development of the shopping center required that the property first be acquired by the State, and condemnation was authorized in the event that acquisition of the properties could not be accomplished through voluntary sale. Efforts at negotiation having failed, these condemnation complaints with orders to show cause were filed against the seven property owners named herein in September 1985 and orders were sought authorizing the appointment of condemnation commissioners.
On January 28, 1986, the return date of the orders to show cause, the trial court delivered an oral opinion, after hearing argument, directing judgments dismissing the complaints. The court noted that the proposed condemnation involved the taking of property from one private owner and ultimately transferring it to another. It determined that such action did not lie within plaintiff's statutory power and, further, that the lack of legislated standards as to when such power could be exercised constitutionally precluded the use of such authority even if it could be discerned by implication. We disagree that the power to condemn for the purpose described above lay beyond plaintiff's statutory power or that the grant of power was unaccompanied by standards sufficiently clear and definite to sustain its constitutionality.
Plaintiff was created under the terms of the New Jersey Housing and Mortgage Finance Agency Law of 1983, N.J.S.A. 55:14K-1 et seq. The Legislature's purpose in enacting the law is explained in the first paragraph of the statement attached to the bill:
This bill merges the New Jersey Mortgage Finance Agency and the New Jersey Housing Finance Agency into a single agency to be known as the New Jersey Housing and Mortgage Finance Agency. The HFA was established in 1967 to assist in financing multi-family housing projects. The MFA was created in 1970 to assist in financing the purchase of single family housing. The new agency will combine these functions and is given a broader grant of authority for financing housing programs. The agency can pool loans, offer *322 incentives, develop cooperatives, organize subsidiary corporations, create a Housing Development Corporation, and issue taxable and nontaxable bonds. It may provide financing for operating, maintaining, constructing, acquiring, rehabilitating or improving various types of housing, ranging from single room occupancy housing to single family homes to multi-family dwellings.
[Senate State Government, Federal and Interstate Relations and Veterans Affairs Committee Statement, Assembly, No. 3463, L. 1983, c. 530].
After setting forth its findings regarding the reduced availability of financing for housing, the Legislature declared that
... it is in the best interests of the residents of New Jersey to create a strong, unified advocate for housing production, finance and improvement which will combine available talent, resources and experience to:
(1) Assure the availability for both rental housing and owner-occupied housing of feasible construction and permanent financing for new housing construction, the conversion of non-residential structures to housing, the rehabilitation and improvement of existing housing, and the transfer of existing housing among owners;
(2) Stimulate the construction, rehabilitation and improvement of adequate and affordable housing in the State so as to increase the number of opportunities for adequate and affordable housing in the State for New Jersey residents, including particularly New Jersey residents of low and moderate income;
(3) Enhance the productive capacity of the private sector in meeting the housing needs of the residents of the State;
(4) Assist in the revitalization of the State's urban areas; and
(5) Respond to changing housing demographic and economic circumstances by the development of innovative and flexible finance vehicles.
[N.J.S.A. 55:14K-2e; emphasis supplied].
N.J.S.A. 55:14K-5 sets forth plaintiff's powers, providing, in part:
In order to carry out the purposes and provisions of this act, the agency, in addition to any powers granted to it elsewhere in this act, shall have the following powers:
....
e. To acquire by purchase, gift, foreclosure or condemnation any real or personal property, or any interest therein, to enter into any lease of property and to hold, sell, assign, lease, encumber, mortgage or otherwise dispose of any real or personal property, or any interest therein, or mortgage lien interest owned by it or under its control, custody or in its possession and release or relinquish any right, title, claim, lien, interest, easement or demand however acquired, including any equity or right of redemption, in property foreclosed by it and to do any of the foregoing by public or private sale, with or without public bidding, notwithstanding the provisions of any other law;
....
s. To make eligible loans, ...;

*323 ....
ff. To do any acts and things necessary or convenient to carry out the powers expressly granted in this act. [Emphasis supplied].
"Eligible loan" is defined under N.J.S.A. 55:14K-3e, as
... a loan, secured or unsecured, made for the purpose of financing the operation, maintenance, construction, acquisition, rehabilitation or improvement of property, or the acquisition of a direct or indirect interest in property, located in the State, which is or shall be: (1) primarily residential in character or (2) used or to be used to provide services to the residents of an area or project which is primarily residential in character. The agency shall adopt regulations defining the term "primarily residential in character", which may include single-family, multi-family and congregate or other single room occupancy housing, continuing-care retirement communities, mobile homes and nonhousing properties and facilities which enhance the livability of the residential property or area; and specifying the types of residential services and facilities for which eligible loans may be made, which may include, but shall not be limited to, parking facilities, streets, sewers, utilities, and administrative, community, educational, welfare and recreational facilities, food, laundry, health and other services and commercial establishments and professional offices providing supplies and services enhancing the area. ... [Emphasis supplied].
The remainder of the act refers primarily to loans made for the purpose of providing housing. There is no separate designation for a nonhousing project or for the recipient of a loan for nonhousing purposes. N.J.S.A. 55:14K-6 and 14K-7, which deal with the procedures and standards for obtaining a loan and the terms and conditions of the loan, refer only to loans to finance housing projects. The only other reference to loans made for support services is found in N.J.S.A. 55:14K-12d. This section enlarges upon the rule-making responsibility of the agency and provides:
These rules and regulations and the terms and conditions for the making or purchase of eligible loans shall effectuate the general purposes of the act and the following specific objectives: (1) the expansion of the supply of funds in the State available for eligible loans, (2) the provision of the additional housing needed to remedy the shortage of adequate housing in the State and to eliminate the existence of a large number of substandard dwellings and (3) the provision of nonhousing facilities which enhance the livability of residential properties or areas being improved through financing by the agency and provide supplies and services primarily to the residents of those residential properties and areas. [Emphasis supplied].
We note, finally, the following directive of the statute:
This act shall be construed liberally to effectuate the legislative intent and the purposes of this act as complete and independent authority for the performance *324 of every act and thing herein authorized and all powers herein granted shall be broadly interpreted to effectuate such intent and purposes and not as a limitation of powers. [L. 1983, c. 530, § 46. See N.J.S.A. 55:14K-1, 1986 Cumulative Annual Pocket Part at 80].
The proposed shopping center is clearly the kind of support facility contemplated by a liberal reading of N.J.S.A. 55:14K-3e and N.J.S.A. 55:14K-12d since it enhances the livability of publicly financed residential properties by providing food and other supplies and services to the residents of those properties. Since the provision of such nonhousing facilities is designated a specific objective of the act we conclude that the powers enumerated in N.J.S.A. 55:14K-5, including the power to acquire property through condemnation, may be invoked for this purpose as well as for the purpose of providing housing.
"Although the power to condemn is to be strictly construed," State v. Maas & Waldstein Co., 83 N.J. Super. 211, 217 (App. Div. 1964), we also observe the principle that a "statute must be construed liberally as a whole in order to effect the declared or clearly implied purposes for which it was enacted," Hyland v. Ponzio, 159 N.J. Super. 233, 238 (App.Div. 1978). "`Authority delegated to an administrative agency should be construed so as to permit the fullest accomplishment of the legislative intent,' and the purpose of the statute should not be frustrated by an unduly narrow interpretation," Ibid., (quoting Cammarata v. Essex Cty. Park Comm'n, 26 N.J. 404, 411 (1958)). The act itself specifies that it is to be liberally construed to effectuate its purposes. The success of the Legislature's primary goal of providing housing will obviously be hampered if plaintiff is denied the requisite powers to assure the availability of support services necessary to the livability of the residential area. It is therefore concluded that the acquisition by condemnation of the properties and the subsequent financing for the purchase thereof from the agency by New Community lie within the agency's statutory powers.
We next consider whether plaintiff's actions herein were taken in accordance with standards sufficiently expressed in *325 the enabling legislation as to withstand a challenge to its constitutionality.
In Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 231-232, 104 S.Ct. 2321, 2324, 81 L.Ed.2d 186, 191 (1984), the Court considered whether the Fifth Amendment provision that "`private property [shall not] be taken for public use, without just compensation,'" made applicable to the states through the Fourteenth Amendment, prohibited Hawaii "from taking, with just compensation, title in real property from lessors and transferring it to lessees in order to reduce the concentration of ownership of fees simple in the State."
On the subject of "public use," the Court quoted Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), where consideration was given to the constitutionality of legislation providing both for the use of the eminent domain power to redevelop slum areas and for the possible transfer of the condemned properties to private interests:
"Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end.... Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established." Id., at 33, 99 L.Ed. 27, 75 S.Ct. 98.
[Hawaii Housing Authority, supra, 467 U.S. at 240, 104 S.Ct. at 2329 (quoting Berman, supra, 348 U.S. at 33, 75 S.Ct. at 102-103)].
The Court in Hawaii Housing Authority, supra, stated that "it will not substitute its judgment for a legislature's judgment as to what constitutes a public use `unless the use be palpably without reasonable foundation.'" 467 U.S. at 241, 104 S.Ct. at 2329-2330. It also noted:
The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose.... The Act advances its purposes without the State taking actual possession of the land. In such cases, government does not *326 itself have to use property to legitimate the taking; it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause. [Id. at 243-244, 104 S.Ct. at 2330-2331].
Thus the constitutionality of Hawaii's actions was upheld. Id. at 245, 104 S.Ct. at 2331.
While the shopping center in this case is to be transferred to private ownership, the condemnation is intended to serve a public purpose, namely, to provide supplies and services for the residents of the housing projects financed by plaintiff, thereby enhancing the livability of the residences. The anticipated private ownership therefore creates no bar to the condemnation under either the United States or New Jersey Constitutions. See Levin v. Tp. Committee of Tp. of Bridgewater, 57 N.J. 506, 543-544 (1971), app. dism., 404 U.S. 803, 92 S.Ct. 58, 30 L.Ed.2d 35 (1971).
Although the power of eminent domain lies with the Legislature, it may delegate the exercise thereof. Wes Outdoor Advertising Co. v. Goldberg, 55 N.J. 347, 351 (1970); State v. Lanza, 27 N.J. 516, 530 (1958), app. dism., 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350 (1959).
"[T]he Legislature may not vest unbridled or arbitrary power in an administrative agency," ... but "[a]s long as the discretion of administrative officers is `hemmed in by standards sufficiently definitive to guide its exercise,' the delegation of legislative powers is not unconstitutional." [Keyes Martin & Co. v. Director, Div. of Purchase, 99 N.J. 244, 254 (1985); citations omitted].
The Court in Keyes Martin, supra, explained:
Standards must accompany the delegation of power for three reasons:
First, [they] prevent the Legislature from abdicating its political responsibility and prevent undemocratic, bureaucratic institutions from wielding all-encompassing, uncontrollable government power. Second, limiting standards define the area in which the agency develops the experience and expertise that the legislature has neither the time nor resources to develop. With too broad a standard the agency stands in no better position than the legislature that created it. Third, and most important, standards facilitate judicial review of agency decisions, which guards against arbitrary and capricious governmental action. As long as the statutory standards achieve these purposes, such *327 standards should be considered sufficiently definite to pass constitutional muster. [Mt. Laurel Township, supra, 83 N.J. 522, 532-33].
Our courts have consistently sustained the delegation of legislative authority under broad and general statutory standards governing the manner in which administrative agencies must exercise the authority delegated.
[99 N.J. at 254-255].
While the act provides guidelines for determining whether to finance a housing project, see N.J.S.A. 55:14K-6e, it does not specify similar guidelines respecting loans to finance related nonhousing projects. The regulations enacted to implement the act do not fill this void. See N.J.A.C. 5:80-1.1 et seq. In fact, N.J.A.C. 5:80-1.4(a)1 specifies that the "regulations of subchapters 2 through 9, 17 and 18 shall not apply to ... [n]onresidential facilities or structures (other than those permitted within a housing project)...." However, as stated in In re Berardi, 23 N.J. 485, 491 (1957):
... in ascertaining the presence of standards and norms to support delegated powers, it is fundamental we are not confined to the four corners of the particular section, but are obligated to examine the entire act in the light of its surroundings and objectives, nor need the standards be set forth in express terms if they may be reasonably inferred from the statutory scheme as a whole. Ward v. Scott, 11 N.J. 117 (1952); Schierstead v. City of Brigantine, 20 N.J. 164 (1955).
Considering the very general standards which have been upheld in other contexts, see Keyes Martin, supra, 99 N.J. at 255, sufficient standards can be gleaned from the act under review to sustain its constitutionality. While, broadly speaking, the agency is commissioned to "[a]ssist in the revitalization of the State's urban areas," N.J.S.A. 55:14K-2e(4), N.J.S.A. 55:14K-12d(3) measurably narrows those powers with respect to nonhousing facilities to those "which enhance the livability of residential properties or areas being improved through financing by the agency and provide supplies and services primarily to the residents of those residential properties and areas." Thus, the agency does not have unbridled discretion to condemn property or provide a loan for the purpose of developing any nonhousing facility.
*328 In Wes Outdoor Advertising Co. v. Goldberg, supra, 55 N.J. at 349-353, the Court upheld the constitutionality of N.J.S.A. 27:7-22.4 which authorized the Commissioner of Transportation to condemn property alongside highways "for landscape and roadside development appropriate for the restoration, preservation and enhancement of scenic beauty...." The Court rejected plaintiffs' arguments that the language was too vague to serve as an objective guide and that there were insufficient standards to limit the location and quantity of land to be taken. Id. at 350-353. It reasoned, in part:
Although the statute does not in finite terms impose a specific limit upon the amount of land which may be acquired, the express purpose of acquisition does delineate a sufficient guide for a reasonable exercise of the power of condemnation. In light of the objectives of the statute it is difficult to envision a more specific limitation which would not by expression or omission unduly restrict the Commission. The very purposes of the act require that he be granted a considerable degree of discretion. Plaintiffs' hypothetical projections of possible abuses are irrelevant as an adequate standard is furnished for a limitation on the exercise of the power of condemnation. The public is protected from an abuse of power or an arbitrary exercise of discretion by recourse to the courts. [Id. at 353; citation omitted].
Similarly in this case, the agency's exercise of discretion is subject to review by the courts for arbitrariness. Also, the procedural safeguards of the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 et seq., help to guard against arbitrary action by the agency. As stated in Motyka, et al. v. McCorkle, et al., 58 N.J. 165, 178 (1971): "Indeed in recent days we have attached greater significance to the presence of procedural and judicial safeguards against unreasonable and unwarranted agency action than we have to the presence of details in the statutory standards." In addition, the expertise developed by the agency to deal with housing matters is sufficiently tied in to the expertise needed to make decisions regarding nonhousing projects providing support services. An appellate court can consider the purposes of the act and reject as arbitrary any condemnation which does not serve those purposes. We conclude that the act provides sufficient standards to guide the *329 exercise of the agency's discretion in condemning property for nonhousing purposes and consequently that the delegation of legislative power was constitutional.
In dismissing the complaints the trial judge also based his determination upon the conceded fact that plaintiff had failed to disclose its appraisals of defendants' properties during prelitigation negotiations. In State by Commissioner of Transp. v. Hancock, 210 N.J. Super. 568 (App.Div. 1985), aff'g 208 N.J. Super. 737 (Law Div. 1985), we upheld a determination by the Law Division interpreting N.J.S.A. 20:3-6 as requiring such disclosure and expressly noted our disapproval of contrary holdings in State v. Rowland, 183 N.J. Super. 558 (Law Div. 1982), and State v. Meisler, 128 N.J. Super. 307 (Law Div. 1974), and our approval of the Law Division opinion in State v. Siris, 191 N.J. Super. 261 (Law.Div. 1983).
Plaintiff urges that since there was a split of New Jersey authority on the legality of its action at the time of the negotiations, dismissal of the complaints should not be mandated. But plaintiff herein is in no different a position than plaintiff in State v. Hancock, supra. As the Law Division there said, "Strictly speaking, the complaint should be dismissed since it should not have been filed until `bona fide negotiations,' had been completed." 208 N.J. Super. at 745. However, since defendants in that case had not asked for dismissal, the Law Division simply denied the appointment of condemnation commissioners  the only relief defendants requested. Ibid. Plaintiff's argument herein that the "split of authority" excuses its failure to conduct bona fide negotiations leaves no doubt in our minds that its noncompliance with N.J.S.A. 20:3-6 was willful and warrants the remedy of dismissal. See Rockaway v. Donofrio, 186 N.J. Super. 344, 354 (App.Div. 1982).
Affirmed.