587 A.2d 260

STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANS-
PORTATION, PLAINTIFF–APPELLANT, v. PHILIP R.T. CAR-
ROLL AND MRS. PHILIP R.T. CARROLL, DEFENDANTS–RE-
SPONDENTS, AND TOWNSHIP OF MOUNT LAUREL, IN THE
COUNTY OF BURLINGTON, A MUNICIPAL CORPORATION
OF NEW JERSEY, DEFENDANT.

Argued September 24, 1990—Decided March 13, 1991.

*Bernard M. Flynn,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel).

*Philip R.T. Carroll* argued the cause *pro se.*

*Arnold K. Mytelka* submitted a brief on behalf of *amicus curiae* Belfer Development Company (*Clapp & Eisenberg,* attorneys; *Arnold K. Mytelka* and *Mark F. Kluger,* on the brief).

*William Z. Shulman* submitted a brief on behalf of *amicus curiae* North Bergen Municipal Utilities Authority (*Shulman &*

*Wall*, àttorneys; *William Z. Shulman* and *Thomas J. Wall*, of counsel and on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this condemnation case, the State sought to acquire a portion of the frontage of private property to widen a highway. The property owner challenged the action on the grounds that the State, contrary to requirements of statute, failed to conduct bona-fide negotiations prior to the condemnation. The trial court found that the State had not conducted bona-fide negotiations because of deficiencies in the State's appraisal, *inter alia*, the omission of information relating to increased traffic noise, which the court considered to be a compensable element of severance damages. The trial court therefore dismissed the condemnation complaint. Following an appeal by the State, the Appellate Division affirmed. 234 *N.J.Super.* 37, 559 *A.*2d 1381 (1989).

The State petitioned for certification. It contended that, contrary to the findings of the courts below, the appraisal was not deficient and did not impermissibly omit noise-impact information as an element of compensable damages. Thus, the State claimed it had not violated its statutory duty to undertake bona-fide negotiations prior to the condemnation. We granted the petition. 118 *N.J.* 197, 570 *A.*2d 961 (1989).

I.

This dispute arises from a State highway project. Because of traffic congestion and high accident rates, the New Jersey Department of Transportation (the DOT or Department) sought to enlarge the portion of Route 38 extending from the New Jersey Turnpike in Mount Laurel Township to Pemberton Road in Mount Holly Township.

Defendant Philip Carroll owns 14.124 acres of land adjacent to Route 38 in Mount Laurel Township. The property is used

as a horse farm and is improved with a single-family dwelling, several outbuildings, and fence-enclosed training areas. The DOT requires a fourteen-foot-wide strip of defendant's 586.96 feet of frontage along Route 38 to complete expansion of the highway. The total taking amounts to 0.189 acre or 8,232.84 square feet, and includes twenty-nine trees and bushes, 240 square feet of gravel driveway, and an established lawn area.

On November 15, 1982, the DOT held a public hearing on the proposed project, which at that time called for an expansion from two to four lanes. Carroll attended that hearing and assumed that none of his land would be taken because the aerial map used at that hearing showed no encroachments on his property.

The project plan was later changed to widen the highway to six lanes, which required a 138–foot right-of-way rather than the 110–foot right-of-way under the original proposal. The DOT did not conduct a second public hearing because it concluded there was no "substantial change" from the initial proposal. Carroll alleges that fifty or more property owners, including himself, were affected by the change, but were given no opportunity to be heard.

By letter dated August 11, 1986, the DOT notified Carroll that the Route 38 project required the purchase of a portion of his property. The Department's letter briefly outlined the appraisal and negotiations process, and referred the property owner to DOT representatives for further information. The letter also informed Carroll that an appraiser would be sent to inspect his property, and that he could accompany the appraiser. Further, the letter stated that DOT "negotiators will be prepared to explain the basis of the State's monetary offer and to answer any questions that you may have regarding the transactions."

The DOT's independent appraiser wrote to Carroll on February 24, 1987, and arranged for an inspection of his property on March 13, 1987. Following that inspection, the appraiser com-

pleted an appraisal report dated April 21, 1987, indicating a pre-taking value of $69,500 per acre, or $981,618 for the entire tract. The appraisal ascribed a value of $13,136 to the 0.189 acre being taken, and $1,364 for damages to the remaining property, resulting in an aggregate value of $14,500 for the taking.

The appraisal also disclosed that the valuation was done by the "comparative approach," rather than the "cost and income approaches." While the report did not include any general descriptions of the three common appraisal methods, it did include three sales of comparable properties in Mount Laurel and Evesham Townships, which were used to value Carroll's property.

The appraisal further disclosed that the property's actual use as a horse farm and single-family residence was not its "highest and best use"; its highest and best use would be the commercial-industrial use for which it was zoned. The record indicates that the comparable sales were selected because those properties were also zoned for commercial-industrial use. The appraisal discounted any damage to the property's improvements because they were not relevant to its use for commercial-industrial purposes. Similarly, the appraisal did not include damages for the trees and bushes along the Route 38 frontage because such landscaping "add[ed] no value to the tract" and would not be necessary if the property were devoted to commercial-industrial use.

Following the appraisal, a DOT negotiator met with Carroll on July 8, 1987. The negotiator showed Carroll a map of the area needed for the Route 38 project and pointed out that various trees would have to be removed; she also gave him a copy of the appraisal and a written offer of $14,500 as compensation for the partial taking. The negotiator attempted to explain the appraisal, but Carroll told her that the offer was much too low and that there was no need to discuss the matter any further. At Carroll's request, the negotiator left.

Subsequently, the negotiator telephoned Carroll on July 17, 1987, and again on August 5, 1987, to schedule another meeting to discuss the State's offer. Carroll refused to negotiate further, and told the negotiator that another meeting would not be necessary because he would not accept the State's offer unless it was increased and compensated him for the trees. The negotiator explained that the trees were not included in the State's offer because "sometimes appraisers do not feel that trees enhance the value of the property." Carroll also asserted that the State should change the basis of its appraisal from the "square-foot" method to the "front-foot" method. The negotiator explained that in the State's view, the front-foot method was not appropriate where a property owner, like Carroll, was not losing his "entire buildable depth behind the frontage." Carroll further told the negotiator that if the appraisal could not be changed, the matter would have to be resolved by the courts.

The DOT again explained its position in a letter dated August 11, 1987, addressing Carroll's concerns about the trees and about the square-foot valuation method. The letter offered an opportunity for further negotiations, while also making clear that if the DOT could not reach an agreement with Carroll, condemnation proceedings would be necessary. The letter nonetheless indicated that the State would "continue negotiations at the next [management] level to protect your rights" and that it "would like to continue negotiations with you if you feel it's possible to resolve this matter." The letter also stated that if Carroll failed to respond within five days, the State would assume the proposed settlement was not acceptable to him and would have the matter reassigned for "preliminary condemnation." Carroll responded by letter dated August 25, 1987, indicating a willingness to try "to enter into good faith negotiations."

Carroll next received two separate, and apparently contradictory, letters from the DOT. One, dated September 2, 1987 and signed by a representative of the Bureau of Acquisition,

stated that "negotiations have been conducted" and that Carroll had rejected a suggested settlement of $14,500; it also stated that Carroll had fourteen days to accept the State's offer or the State would institute condemnation proceedings. The second, dated September 3, 1987, asserted that the State was "ready and willing to meet with you at your convenience, to negotiate this taking." Carroll did not respond to either letter, and on October 30, 1987, the State filed its condemnation complaint.

The trial court dismissed the complaint, concluding that the State had not engaged in bona-fide negotiations as required by statute. The court based its determination on four factors: (1) the appraisal was accompanied by a "one-price offer"; (2) the appraisal was unintelligible; (3) the appraisal omitted information on noise damages, which the court found to be an element of compensation in partial-taking cases; and (4) appraisals of neighboring properties should have been made available.

On the State's appeal, the Appellate Division affirmed the order dismissing the complaint, but on somewhat different grounds. Unlike the trial court, the Appellate Division determined that the duty to engage in bona-fide negotiations was not violated by (1) the State's one-price offer; (2) any unintelligibility of the appraisal report; or (3) the failure to provide appraisals of neighboring properties. 234 *N.J.Super.* at 50, 53–55, 559 *A.*2d 1381. Nevertheless, the Appellate Division concluded that the State had not negotiated in good faith for two reasons. First, the State had failed to provide a sufficient description of the appraisal valuation method. Second, it had failed to provide information concerning the impact of increased noise, which, in the view of the Appellate Division, should have been provided because noise damages are compensable in a partial-taking case. *Id.* at 49, 56, 559 *A.*2d 1381.

## II.

The Eminent Domain Act (the Act) provides that prior to a condemnation proceeding the State must conduct "bona fide

negotiations" with the condemnee. *N.J.S.A.* 20:3–6. While "bona fide negotiations" are not defined, the Act provides that they must include

> an offer in writing by the condemnor to the prospective condemnee * * * setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules.
>
> [*Ibid.*]

If the State does not conduct the requisite negotiations, the condemnation complaint will be dismissed. *Borough of Rockaway v. Donofrio*, 186 *N.J.Super.* 344, 354, 452 *A.*2d 694 (App. Div.1982); *accord, Monmouth County v. Whispering Woods*, 222 *N.J.Super.* 1, 10, 535 *A.*2d 968 (App.Div.1987) (noting that dismissal of the complaint will have a "prophylactic effect" and promote compliance with the statute), *certif. denied*, 110 *N.J.* 175, 540 *A.*2d 173 (1988).

Courts have noted that bona-fide negotiations are especially important where, as here, only "minor" property interests are being condemned. *Commissioner of Transp. v. Hancock*, 208 *N.J.Super.* 737, 738, 506 *A.*2d 855 (Law Div.), *aff'd*, 210 *N.J.Super.* 568, 510 *A.*2d 278 (App.Div.1985). Indeed, the protection of "unsophisticated" and "unknowledgeable" owners is an important objective of the requirement. *Whispering Woods, supra*, 222 *N.J.Super.* at 10, 535 *A.*2d 968. As the trial court stated in *Hancock*, condemnees subject to small takings may well be unable to afford lawyers and appraisers for condemnation proceedings; such landowners "must be given every assurance that their government, spending, in part, their money, is treating them with absolute candor and fairness." 208 *N.J.Super.* at 738, 506 *A.*2d 855.

The Legislature certainly intended that the Act's requirements of a fair offer, reasonable disclosure, and bona-fide negotiations be construed and applied in a manner protective of property owners. *See F.M.C. Stores Co. v. Borough of Morris Plains*, 100 *N.J.* 418, 426, 495 *A.*2d 1313 (1985) ("in the condemnation field, government has an overriding obligation to deal

forthrightly and fairly with property owners"). The Eminent Domain Revision Commission, established in 1962, expressed strong misgivings about the State's hard-nosed practices in dealing with condemnees:

Complaints have been made to the Commission that negotiations for acquisition are frequently conducted in an arbitrary manner. The owner is advised merely of the dollar amount of the offer, but is given no information, even if he requests, as to the manner of ascertaining the amount so offered. It is believed that such treatment of a property owner is improper. The Commission is of the opinion that if fair offers are made based upon appropriate data disclosed to the owner, many acquisitions will be completed amicably, without subjecting the authority and the owner to the expense and delay of litigation.

[*Donofrio, supra,* 186 *N.J.Super.* at 350, 452 *A.*2d 694.]

Consistent with the concern for fairness to the property owner, the Act's requirement of bona-fide negotiations has been strictly construed by the courts. *See Donofrio, supra,* 186 *N.J.Super.* at 354, 452 *A.*2d 694 ("[i]f a condemnor may ignore the statute and later cure the proceedings, the purpose of *N.J.S.A.* 20:3–6 will be completely frustrated"). Disputes about the requirement have frequently involved the State's correlative statutory obligation to make "a reasonable disclosure of the manner in which the amount of .... offered compensation has been calculated." *N.J.S.A.* 20:3–6. Thus, in *Monmouth County v. Whispering Woods, supra,* 222 *N.J.Super.* 1, 535 *A.*2d 968, the court concluded that the County had not fulfilled the prerequisites of reasonable disclosure and bona-fide negotiations because it had not supplied the property owners with its appraisal and had not explained how the offered compensation had been calculated. Similarly, in *Morris County v. 8 Court Street Ltd.,* 223 *N.J.Super.* 35, 537 *A.*2d 1325 (App.Div.), *certif. denied,* 111 *N.J.* 572, 546 *A.*2d 500 (1988), the owners had not been given either of the State's two appraisals or an explanation of how the State's offer had been calculated. In *Morris County v. Weiner,* 222 *N.J.Super.* 560, 565, 537 *A.*2d 752 (App.Div.), *certif. denied,* 111 *N.J.* 573, 546 *A.*2d 501 (1988), the court determined that where there was "concrete and highly credible evidence" of a higher value, *i.e.,* a recent bank mortgage appraisal and a third-party offer, the State's duty to

negotiate will go beyond furnishing its appraisal and making its offer.

Here, one reason for the trial court's conclusion that no bona-fide negotiations had occurred was the State's use of the "one-price" offer method, which that court viewed as making negotiations impossible. The Appellate Division rejected that ruling and held that the State's method for structuring price discussions with landowners did not violate *N.J.S.A.* 20:3–6.

We agree with the Appellate Division. The trial court misunderstood the function of the one-price offer and its relevance to bona-fide negotiations. The one-figure valuation is the established procedure for condemnation offers in this state. *N.J. A.C.* 16:5–2.1(d) provides:

the Agency shall establish an amount which it believes is just compensation.... The amount shall not be less than the approved appraisal of the fair market value.... The Agency shall make a written offer to the owner to acquire the property for the full amount believed to be just compensation.

Contrary to the perception of the trial court, the procedure is meant to protect landowners negotiating with the State. The objective of requiring an initial full-price offer is to prevent the State from making low offers to gain a bargaining advantage, forcing owners into adversarial positions in order to secure the full market values of their properties. The one-price procedure assures that the property owner will obtain no less than the State's genuine determination of the fair market value of the property taken. That salutary policy and common sense understanding are confirmed by the widespread use of one-price offers in condemnations by the federal government and other states. *See, e.g.,* Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 *U.S.C.* § 4651(3) (offer must be for "full amount" of the "appraisal of the fair market value"); Delaware Real Property Acquisition Act, 29 Del.C. § 9505(3) (offer must reflect amount "reasonably believed" to be "just compensation," which "[i]n no event" shall be less than "appraisal of the fair market value"); New York Eminent Domain Procedure Law, § 303 (offer should represent

"one hundred per centum" of "just compensation," which "[i]n no event shall ... be less than the condemnor's highest approved appraisal"). Indeed, the whole thrust of the eminent-domain process is that the State should operate differently from an open-market, arms-length buyer. *Commissioner of Transp. v. Siris*, 191 *N.J.Super.* 261, 266–67, 466 A.2d 96 (Law Div. 1983). Thus, the State has to make its "best offer" up front.

The trial court objected to one-price offers primarily because of the perceived limitations on raising the offer. Carroll had argued that district supervisors could approve increases only up to $1,000, that both the Chief of the Bureau of Acquisitions and the Director of the Division of Right of Way had to approve increases of up to $2,000, and that it was not possible for the State to increase the offer by more than $2,000. The State, on the contrary, contended that its procedures allow increases of any amount, but that the Assistant Director and Director would have to approve increases over $2,000. The Appellate Division found that "[p]arties to a negotiation usually have some pre-set determination of how high or low they are willing or authorized to go in bargaining. We cannot say that the State's asserted organizational structure ... *per se* constitutes an inability to engage in bona fide negotiations." 234 *N.J.Super.* at 54, 559 A.2d 1381.

Again, we are in substantial agreement with the Appellate Division. The record does not demonstrate that either the conduct of DOT representatives or DOT internal policies frustrated bona-fide negotiations. Rather, the record indicates that Carroll understood the nature of the one-price offer, demanded that it be raised, and rejected the State's attempts to continue negotiations.

The trial court also determined that the State had not engaged in bona-fide negotiations because the DOT's appraisal form was "unintelligible." The trial court noted that the form contained many pages marked "not applicable," and that the narrative report's sections are scattered over partial pages and

inserts, rather than being presented as continuous text. The trial court's observations are well founded insofar as it is difficult to follow the different sections of the appraisal and the subheadings are tenuously related to the content.

However, despite those practical deficiencies, the Appellate Division disagreed with the trial court's conclusion. The Appellate Division found that the appraisal was not "unintelligible" in the sense that it could not be read and understood by a property owner. 234 *N.J.Super.* at 55, 559 *A.*2d 1381. We similarly conclude that the appraisal report, although in need of improvement and clarification, was sufficiently comprehensible and did not *per se* frustrate bona-fide negotiations.

Both courts below concurred in the finding that the State had failed to provide a sufficient explanation of its appraisal method. The appraisal stated that "[t]he Cost and Income Approaches will not be applied. The Comparative Approach will be used to value the subject site." The Appellate Division believed that the mere inclusion of the sales of comparable properties was not sufficient to reveal the valuation approach; "[w]ithout an accompanying explanation of the comparative approach, the purpose of the inclusion ... is simply not clear." 234 *N.J.Super.* at 55–56, 559 *A.*2d 1381.

However, the issue is how *much* appraisal information meets the "reasonable disclosure" requirement of *N.J.S.A.* 20:3–6. Here, the trial court in effect required "full disclosure" or "complete information." The Appellate Division seemingly believed that pre-negotiation disclosure was coextensive with the standard of *Rule* 4:73–1, which requires a "description of the appraisal valuation method or methods relied upon." 234 *N.J. Super.* at 55, 559 *A.*2d 1381. *Rule* 4:73–11, however, provides that parties to a condemnation proceeding may *not* employ the normal discovery devices except by leave of court, implying that prelitigation "reasonable disclosure" under *N.J.S.A.* 20:3–6 would ordinarily not be as extensive as discovery during litigation.

■ The reasonableness of pre-negotiation disclosure centers on the adequacy of the appraisal information; it must permit a reasonable, average property owner to conduct informed and intelligent negotiations. We thus concur in the observation of the Appellate Division that an appraisal should contain an explanation of the valuation approach or methodology actually used. A property owner ordinarily needs such information to understand the appraisal and to engage in constructive negotiations.

■ We nevertheless disagree with the Appellate Division that in this case the appraisal information provided was so limited as to preclude bona-fide negotiations. The appraisal's description of the valuation method, its inclusion of "comparable" sales, and its specific rejection of other valuation methods, *i.e.*, the income and cost approaches, imparted minimally sufficient information to the property owner. Carroll betrayed no uncertainty or confusion about the valuation approach, the inclusion of comparable sales, or the effect of the property's zoning. The differences among the common appraisal approaches were never a point of contention or misunderstanding. Further, Carroll presented detailed criticisms of the appraisal, argued for different valuation applications (*i.e.*, the front-foot method), and expressed his views on items of compensation he thought were lacking (*i.e.*, damages for loss of his trees and shrubs).

■ We further agree with the Appellate Division's finding that the negotiations were not deficient because the State had not made available the appraisals of neighboring properties. While such information could become germane and discoverable in later condemnation proceedings, the State need not furnish it with the pre-negotiation appraisal. In this case, it does not appear that the failure to provide such appraisals discouraged or inhibited negotiations. Moreover, the relevance of such appraisal information was not a subject of discussion or a point of disagreement between Carroll and the State.

■ The Appellate Division also found that the "chronology of events" contributed to the failure to conduct bona-fide negotiations. 234 *N.J.Super.* at 54, 559 *A.*2d 1381. The Appellate Division clearly did not consider the critical events to be the DOT's frequent and consistent efforts to furnish additional information and pursue negotiations; rather, the Appellate Division emphasized the apparently conflicting letters the DOT sent to Carroll in close succession. The DOT's letters of September 2 and 3, 1987, were concededly at cross-purposes, and appear to have resulted from a lack of internal communication between DOT departments. Certainly, the DOT should correct its procedures to ensure that its correspondence will not be inconsistent. Letters such as those sent to Carroll could present a danger of confusing their recipients. The record in this case, however, does not demonstrate that Carroll was actually misled by the letters or that the correspondence subverted negotiations.

Carroll had been given the DOT's formal offer and appraisal on July 8, 1987; on that date, he had told the DOT negotiator that the offer was much too low and there was no need to discuss it. When telephoned by the negotiator on July 17, 1987 and August 5, 1987, he clearly stated that if the appraisal could not be changed, the matter would have to be resolved by the courts. Nonetheless, the DOT wrote again on August 11, 1987, still expressing willingness to negotiate, but stating that unless Carroll responded in five days, the DOT would go forward with preliminary condemnation proceedings. Carroll did not respond to the August 11th letter until August 25, 1987. Had he desired more time to prepare his response, Carroll could have notified the DOT within the specified time period. Prior to his August 25, 1987 letter, Carroll had consistently taken the position that further negotiations would be fruitless. Nevertheless, the DOT's letter of September 3rd, sent one day after the letter setting a deadline for condemnation proceedings, clearly sought to continue negotiations. We therefore cannot conclude that Carroll believed the State had irrevocably fore-

closed negotiations. There is, moreover, nothing to suggest that he was perplexed or confused. Carroll made no response to either of the DOT's letters; if he had wished to continue negotiations, he could have inquired about the letters or tried to renew discussions before the State filed its condemnation complaint on October 30, 1987.

Rather, throughout the "chronology of events," at least until his August 25th letter, Carroll repeatedly indicated that he was not willing to continue discussions in order to avoid litigation. He never indicated that he wanted further appraisal information or misunderstood the valuation data. The State's duty to negotiate in good faith can be tempered by a property owner's failure to cooperate. "Even where the value or price of the property is the principal issue.... [an] owner may be so intransigent in his position as to preclude meaningful discussions." *Monmouth County v. Whispering Woods, supra,* 222 *N.J.Super.* at 9, 535 *A.*2d 968. "Cases will undoubtedly arise in which invitations by a condemning authority to negotiate are ignored or tardily answered, and courts will have to determine the point at which the condemnor's invitation matures into an attempt to acquire the property through bona fide negotiations." *Morris County v. Weiner, supra,* 222 *N.J.Super.* at 567, 537 *A.*2d 752. "We would be short on realism.... were we not to note that it takes at least two to negotiate and the record should be reviewed with that in mind." *Whispering Woods, supra,* 222 *N.J.Super.* at 9, 535 *A.*2d 968.

In conclusion, we find that the State properly used the one-price offer procedure. We also believe that the State should, ideally, present its appraisal information in more readable form. Its presentation to Carroll was complicated and difficult to follow. Nevertheless, it was not so unintelligible or incomprehensible as to negate the realistic opportunity for bona-fide negotiations. Further, we determine that the State should include with its appraisal an explanation of its valuation methodology. Here, there was no explanation of method *per se.* Nevertheless, we are satisfied that the information impart-

ed, while seemingly insufficient, did not mislead Carroll or fail
to acquaint him with the general approach used, and, under the
circumstances, it did suffice for purposes of initiating bona-fide
negotiations. We also conclude that the State adequately
evinced its intention to negotiate in good faith, and did not
prematurely or unreasonably cut off negotiations. Under the
circumstances, the factors objected to by Carroll and considered
by the lower courts did not separately or collectively constitute
a violation of the State's duty of bona-fide negotiations.

## III.

Carroll has contended that the State's appraisal and offer are
deficient because they do not include any damages for the
increased traffic noise that will result from the widening of
Route 38. He has argued that the State violated its duty to
negotiate because it did not give him noise-impact and environ-
mental-impact studies, and did not expressly make the issue of
noise damages a part of the negotiations. Carroll first raised
the issue of noise damages before the trial court; he had
requested and received copies of the noise studies from the
DOT during the pendency of the condemnation action, in Febru-
ary 1988. The trial court found that noise damages should be
compensable in a partial taking, and that the State's failure to
supply noise-impact information and to disclose its position
regarding noise damages in the appraisal, made it impossible
for Carroll to conduct negotiations effectively.

Despite a paucity of support in the record, the trial court
believed that noise damages were available, reasoning that
prior New Jersey decisions supported compensation for noise
damages in takings of special-use property, and that residential
property should also qualify for noise damages. The Appellate
Division affirmed, holding "that noise damages may be compen-
sable in a condemnation action, and are not restricted to those
whose property is put to 'special uses.'" 234 N.J.Super. at 49,
559 A.2d 1381. The Appellate Division concluded that "the

State here had an affirmative obligation to provide the condemnee with noise studies which it had available." *Ibid.*

The courts below conceded that the compensability of noise damages for property other than that devoted to a "special use" is an unsettled question under New Jersey law. We would note that there is very little authority to support compensability even for "special use" properties. In *Board of Education v. Palmer*, 88 *N.J.Super.* 378, 212 *A.*2d 564 (App. Div.1965), *rev'd*, 46 *N.J.* 522, 218 *A.*2d 153 (1966), the Appellate Division had found that highway construction would destroy the beneficial use of a school property because of, *inter alia*, increased noise. However, this Court found that the effect on the school was speculative because the highway had not yet been built. We therefore expressly reserved decision on the issue of whether such a destruction of beneficial use could be a compensable taking. 46 *N.J.* at 525–26, 218 *A.*2d 153. One decision of the Law Division, *Highway Commissioner v. Board of Education*, 116 *N.J.Super.* 305, 282 *A.*2d 71 (1971), did allow damages for increased noise and air pollution resulting from highway construction adjacent to a school. We would note, however, that because the court considered its award a form of compensatory damages, that decision would not directly support noise damages under the traditional law of condemnation. Insofar as the *dicta* of the Appellate Division in *County of Ocean v. Landolfo*, 132 *N.J.Super.* 523, 529, 334 *A.*2d 360 (1975), may indicate that New Jersey law definitely supports noise damages for "special use" properties, that conclusion may be overly ambitious. There is simply no established rule that noise damages are compensable in takings of "special use" properties. *See Palmer*, 46 *N.J.* 522, 218 *A.*2d 153.

Nor is the issue of noise damages much clarified by a review of the law of other jurisdictions. As the Appellate Division acknowledged, other states "are divided on the issue of whether to permit noise damages to the remainder in [partial condemnation] cases...." 234 *N.J.Super.* at 47, 559 *A.*2d 1381. That

statement fails to convey, however, the multiplicity of views and lack of consensus expressed in the cases.

Some courts have elected the clear but perhaps extreme positions of either denying compensation under any circumstances, *e.g.*, *Road Comm'n v. Williams*, 22 *Utah* 2d 331, 452 *P.*2d 881 (1969), or permitting compensation for damages caused by the entire public improvement. *E.g.*, *Brannon v. State Roads Comm'n*, 305 *Md.* 793, 506 *A.*2d 634 (1986); *City of Amarillo v. Attebury*, 303 *S.W.*2d 804 (Tex.Ct.App.1957). Other courts have adopted variant rules. Some permit compensation only for damages caused by that portion of the improvement located on the condemned land. *E.g.*, *Commonwealth, Dep't of Highways v. Williams*, 487 *S.W.*2d 290 (Ky.1972); *Board of Transp. v. Brown*, 34 *N.C.App.* 266, 237 *S.E.*2d 854 (1977), *aff'd*, 296 *N.C.* 250, 249 *S.E.*2d 803 (1978). Courts have also permitted compensation only if the remaining land is put to a special use, such as a school or a church. *E.g.*, *Highway Comm'r v. Board of Educ.*, *supra*, 116 *N.J.Super.* 305, 282 *A.*2d 71; *State, Dep't of Highways v. United Pentecostal Church*, 313 *So.*2d 886 (La.Ct.App.), *cert. denied*, 318 *So.*2d 60 (La.), *cert. denied*, 423 *U.S.* 1018, 96 *S.Ct.* 453, 46 *L.Ed.*2d 389 (1975). Several courts allow compensation only if noise damage is special or peculiar to the land taken. *People ex rel. Dep't of Pub. Works v. Presley*, 239 *Cal.App.*2d 309, 48 *Cal.Rptr.* 672 (1966); *City of Lakewood v. DeRoos*, 631 *P.*2d 1140 (Colo.Ct. App.1981); *Mississippi State Highway Comm'n v. Colonial Inn, Inc.*, 246 *Miss.* 422, 149 *So.*2d 851 (1963). There are decisions that permit compensation only if the entire beneficial use of the property is destroyed. *E.g.*, *Division of Admin., Dep't of Transp. v. West Palm Beach Garden Club*, 352 *So.*2d 1177 (Fla.Dist.Ct.App.1977). A few courts recognize noise impact as a factor contributing to the decrease in market value of the remaining area, rather than as a separate item of severance damages. *San Diego Gas & Elec. Co. v. Daley*, 205 *Cal. App.*3d 1334, 253 *Cal.Rptr.* 144 (1988); *Colonial Inn*, *supra*,

246 *Miss.* at 430, 149 *So.*2d at 855; *Dennison v. State,* 22 *N.Y.*2d 409, 239 *N.E.*2d 708, 293 *N.Y.S.*2d 68 (1968).

 Despite the complexities of the question of noise damages and the sparse support for such damages under New Jersey law, we do not imply that if faced with a sufficient factual record, we would necessarily join those jurisdictions that entirely refuse to grant noise damages. We have stated that *"all* material facts and circumstances" that could influence potential buyers of the remaining parcel should be considered in valuing that property for purposes of determining severance damages. *Commissioner of Transp. v. Silver,* 92 *N.J.* 507, 515, 457 *A.*2d 463 (1983). We have also noted that a compensation award should indemnify a landowner as fully as possible and that just compensation should be regarded " 'from the point of view of the owner and not the condemnor.' " *Commissioner of Transp. v. William G. Rohrer, Inc.,* 80 *N.J.* 462, 467, 404 *A.*2d 29 (1979) (quoting 4 *Nichols, Eminent Domain* § 12.21 at 12–86.1 (3rd ed. 1978)). In an appropriate case with an adequate record, damage from increased traffic noise may be a factor that at the time of the taking demonstrably affects the market value of land. *See South Carolina State Highway Dep't v. Bolt,* 242 *S.C.* 411, 419, 131 *S.E.*2d 264, 268 (1963) (in a partial taking, market value of remainder can be affected by impact on use of remaining buildings).

 The record in this case is an insufficient basis for a judgment that increased noise may be considered as an element of just compensation. Nothing in the record or in antecedent authority indicates that the DOT would have been required to consider noise when making its appraisal of fair market value and offer of compensation. The only information concerning a possible increase of noise due to the widening of Route 38 was contained in the impact studies that the DOT conducted to comply with procedures for federal funding. Apparently, those studies are required by the federal highway aid program to determine whether a state highway project must include mea-

sures to mitigate the effects of increased noise. The impact studies included in the record indicated that any increase in noise would be insufficient to require mitigating measures. There is no basis for determining that increased noise could affect the fair market value of Carroll's remaining property. Thus, we cannot conclude that the DOT was unjustified in assuming that noise impact was not relevant to the valuation of the property.

Moreover, as the State has maintained, Carroll did not raise the issue of noise during the pre-complaint discussions. Nor did he at any time present any expert testimony, independent studies, or appraisals concerning noise damages, or demonstrate that even if the noise studies had been furnished with the appraisal, they realistically would have influenced the negotiations. We find under the circumstances that the DOT had no duty to provide the noise-impact studies to the condemnee; no actual prejudice was visited on Carroll from the omission of those studies; and the State's failure to furnish that information did not imperil bona-fide negotiations.

Given the state of the record, it is not appropriate to address the difficult and unsettled question of the general compensability of noise damages. Any pronouncement on compensability of such damages should await a more concrete presentation of the effect of noise on a particular condemned parcel. Under the present state of the law, the DOT is free to contend, as it did in this case, that it does not consider noise an item that must be accounted for in an appraisal of fair market value. On the other hand, during the further proceedings in this action before the trial court, Carroll is certainly free to demonstrate any alleged damage to the remainder of his property from the increased noise that he asserts will result from the project.

## IV.

Accordingly, the judgment of the Appellate Division is reversed and the case is remanded to the Law Division.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.